[S. F. No. 580. In Bank.—December 27, 1897.]

CHARLES K. McCLATCHY, Petitioner, v. SUPERIOR COURT OF THE COUNTY OF SACRAMENTO, A. P. CATLIN, Judge, Respondent.

<table>
<tr><td>119</td><td>413</td></tr>
<tr><td>136</td><td>686</td></tr>
<tr><td>136</td><td>687</td></tr>
</table>

Contempt of Court—Newspaper Publications—Report of Evidence—Criticism of Judge—Refusal to Permit Evidence—Excess of Jurisdiction—Certiorari.—Where a charge of contempt of court against a publisher of a newspaper alleged the making of publications therein, which were "false, scandalous, and defamatory," and "intended to degrade the said court, and excite public prejudice and odium against it, and were unlawful interferences with the proceedings of the court," and it appeared that an account of testimony given in a pending cause was published therein, and that the judge upon his attention being called thereto by an attorney in the cause, stated from the bench that it was a grossly false and fabricated statement, whereupon the newspaper reasserted the truth of the account and declared that the attorney and judge knew it was correct, and severely criticised the judge, and expressed contempt for him for approving "the unmitigated falsehood of an attorney"; and where the defense to the charge of contempt of court was that the publications were in fact true, and not made with any wrongful intent, and that the personal references to the judge were merely in response to his aspersions in characterizing the statements in the news-

paper as false and fabricated, when they were in fact true, and that such references were not made with purpose of interfering with the administration of justice; and where the publications were admitted to have been made, and the only testimony in support of the charge was that of the court reporter, to the effect that the matter published did not correspond with his notes of the evidence, and that prior to the second publication he had furnished to the publisher a correct transcript of his notes; and the judge refused to permit the publisher to introduce evidence to prove the truth of the account of evidence published, *held*, that an order adjudging him guilty of contempt of court was in excess of jurisdiction, and should be annulled upon *certiorari*.

Id.—Publication of Truth as to Legal Proceedings—Criticism of Judge, when not a Contempt of Court.—The publication of the truth as to legal proceedings or the criticism of a judge, if made only in response to an unjust charge upon the veracity of the publisher, and without intent improperly to influence the proceedings of the court, does not constitute a contempt of court.

Id.—Aspersions by Judge from Bench—Right of Defense.—A judge on the bench has no more right than any other person to cast aspersions upon the character of a person not a party or participant in a case on trial, without a right in the latter to defend himself.

CERTIORARI in the Supreme Court to annul an order of the Superior Court of Sacramento County, adjudging the petitioner guilty of contempt. A. P. Catlin, Judge.

The facts are stated in the opinion.

P. Reddy, Delmas & Shortridge, John E. Richards, and Garrett McEnerney, for Petitioner.

S. S. Holl, and A. P. Catlin, for Respondent.

VAN FLEET, J.—*Certiorari* to review an order of the respondent adjudging petitioner guilty of contempt.

While the cause of *Talmadge v. Talmadge* was on trial in the superior court of Sacramento county, an article appeared in the *Sacramento Bee*, a newspaper published in the city of Sacramento, purporting to be an account of certain testimony given by one of the witnesses; and when, at the opening of court next day, its attention was called to the article by one of the attorneys in the cause, the judge stated from the bench that he had no hesitation in saying that the statement referred to was a grossly false statement, a gross fabrication, and that there was not the slightest ground in the testimony of the witness upon which such

a statement could be based.  In the afternoon of that day the
*Bee* published in its editorial columns the following article:

"The *Bee* will not keep in its employ a reporter who garbles
or who misstates, but when a newsgatherer does his duty and
tells the truth it will not stand silently by while an aggregation
of attorneys try to make him out a liar, and while a prejudiced
and vindictive czar upon the bench aids and abets them in such
a purpose.  The *Bee* reasserts that in all material details the state-
ment of Talmadge, as given in the *Bee* of yesterday, was the
statement that he made upon the stand at Monday afternoon ses-
sion.  The *Bee* will go further than that.  It will declare that
both the attorney before the bar and the judge on the bench
knew that the statement made in the *Bee* was an essentially cor-
rect epitome of the testimony given by Mr. Talmadge, at the
very moment when they unhesitatingly, shamelessly, and brazen-
ly declared it to be a gross fabrication.  There is no paper any-
where that has a higher regard for fair and impartial courts than
has the *Bee*, but there is no paper anywhere that has a supremer
contempt than has the *Bee* for a judge who will approve the un-
mitigated falsehood of an attorney, as Judge Catlin to-day ap-
proved the brazen misstatement of Judge J. B. Devine."  Similar
language was repeated in the columns of the newspaper on the
two succeeding days.  The petitioner herein is the editor and
one of the proprietors of the *Bee*, and on June 2, 1896, upon an
affidavit of Mr. C. T. Jones setting forth these publications, and
that the same was an interference with the proceedings of the
court in the trial of the cause, and constituted a contempt of
said court, a citation was issued directing him to show cause why
he should not be punished for said contempt.  In obedience to
the citation, the petitioner appeared in court and filed an an-
swer acknowledging that the article was published by his author-
ity and justifying its publication upon the ground, among oth-
ers, that it was in fact a correct report of the proceedings at the
trial, and that it was published in order to defend himself from
the charge made by the judge of the court, and in his answer re-
peated the charges made in the article published.  Upon the
hearing of the charge, the court found the facts in accordance
with the affidavit of Mr. Jones, and that the publications were
an unlawful interference with the proceedings of the court in the

trial of the cause, and adjudged the petitioner guilty of the contempt alleged, and that he pay a fine of five hundred dollars. The petitioner seeks by this proceeding a judgment annulling this order of the superior court.

There is but one point which need be considered. It is contended, and we think correctly, that the order under review is void for the reason, clearly disclosed by the record, that the petitioner was denied his constitutional right to be heard in his defense. The charge against him was in making certain publications in his newspaper relating to the evidence in the case on trial, alleged in the affidavit upon which he was cited to be "false, scandalous, and defamatory," and which "were intended to degrade the said court and excite public prejudice and odium against it and were unlawful interferences with the proceedings of said court." The *gravamen* of this charge was the alleged false character of the publications and the wrongful intent of petitioner in making them to bring the court into contempt, and thus interfere with the orderly administration of justice in the cause on trial. That this was the understanding and theory of the prosecution is shown by the course of proceeding in the court below. To prove the false character of the matter published by petitioner, the prosecution introduced the court reporter, who testified that the matter published, purporting to be a statement of the evidence as given in the action on trial at the time, did not accord with his notes of such evidence; and to show that petitioner acted with malicious intent it was proved by the reporter that before the second publication appeared he had furnished to petitioner what purported to be a correct transcript of his notes of that portion of said evidence to which the publication referred. This was substantially the case of the people, the publications being admitted. The substantive defense was that the publications were in fact true, and not made with any wrongful intent; that the personal references therein to the judge were merely in response to the aspersion of the latter cast upon petitioner in characterizing the statements in his newspaper as false and fabricated, when in fact they were not, and that such personal references were not made for the purpose of interfering with the administration of justice. That this was a complete defense, if sustained by evidence, there can, we think,

be no doubt.   The publication of the truth as to legal proceed-ings is not a contempt of court (*In re Shortridge,* 99 Cal. 526); and the criticism of the action of the judge, if made only in prop-er response to an unjust charge against petitioner's veracity, and without intent to improperly influence the proceedings of the court, would not be contemptuous.   It is said that the language of the judge was not directed at petitioner, but to the reporter on his paper; but we do not think the language will justly bear this limitation.   A judge on the bench no more than any other can cast aspersions upon the character of a person not a party or participant in a case on trial, without a right in the latter to defend himself.   Petitioner might not have been able to estab-lish this defense, but he was not permitted to make the effort. When the case of the people rested this occurred:

"Mr. Reddy.—We want to call witnesses to show that the pub-lication in the *'Bee'* was in point of fact true.

"The Judge.—I will not hear testimony further than what has already appeared on that subject, as stated by the reporter. I will not allow this matter to degenerate into a controversy as to the correctness of the reporter's notes.

"Mr. Reddy.—Then we will not be allowed to introduce any evidence at all—is that the proposition—if these notes are to be taken as correct?

"The Judge.—I shall act only on the official notes, as given you by the reporter.   I will hear no other testimony.

"Mr. Reddy.—We wish to show that the notes are not correct, in so far as they differ from the report in the *'Bee,'* and that the testimony as reported in the *'Bee'* was actually given on that occasion.

"The Judge.—I will not hear any outside testimony other than the notes of the official reporter. . . . .

"Mr. Reddy.—Your honor will allow no testimony except the reporter's notes?

"The Judge.—No.

"Mr. Reddy.—Then your honor will not permit us to put in evidence the subject matter—the allegations of the answer?

"The Judge.—I have made my ruling that I will hear no tes-timony in regard to the evidence that was taken there except what is contained in the notes of the official reporter, and they

have been fully given, and I will add to that the cross-examination of Mr. Duden [the reporter] with respect to those questions that the court asked him in regard to the time when he delivered the transcribed notes to the '*Bee*.' "

Thereupon the defendant offered and requested to be allowed to introduce evidence in support of the various subdivisions of his answer, involving as a whole the same general issues as suggested above, but was denied such right, except to the extent that he was told he would be allowed to show that the publications were "without malice." This privilege was declined as of no avail unless petitioner was allowed to put in his entire defense.

That the result of this action of the court in thus requiring petitioner, in effect, to submit his defense upon the evidence for the people, was, in substance and effect, to deprive petitioner of the right to be heard in his defense, is, we think, obvious. It is contended by respondent that, even if the action of the court was wrong, it was error merely, which cannot be reviewed on *certiorari;* that the court having jurisdiction of the person and subject matter, the mere method in which it exercised such jurisdiction cannot be inquired into in this proceeding, which looks only to the question of jurisdiction. If the premise were correct, the conclusion would undoubtedly follow. But with the view that the action involved no more than mere error we cannot coincide. It was error, certainly, but it was more than that. It was a transgression of a fundamental right guaranteed to every citizen charged with an offense, or whose property is sought to be taken, of being heard before he is condemned to suffer injury. Any departure from those recognized and established requirements of law, however close the apparent adherence to mere form in method of procedure, which has the effect to deprive one of a constitutional right, is as much an excess of jurisdiction as where there exists an inceptive lack of power. "The substance and not the shadow determines the validity of the exercise of the power." (*Postal Tel. etc. Co. v. Adams*, 155 U. S. 689, 698.)

While the writ of *certiorari* is not a writ of error, "it is nevertheless," as suggested in *Schwarz v. Superior Court*, 111 Cal. 112, "a means by which the power of the court in the premises

can be inquired into; and for this purpose the review extends not only to the whole of the record of the court below, but even to the evidence itself, when necessary to determine the jurisdictional fact."

If, then, by looking at the evidence we can see that the court exceeded its power, we have a right to examine the evidence for that purpose. The evidence and proceedings in this case disclose clearly to our minds such an excess. Contempt of court is a specific criminal offense (*Ex parte Hollis*, 59 Cal. 408; *Ex parte Gould*, 99 Cal. 360; 37 Am. St. Rep. 57); and a party charged therewith, although the proceeding is more or less summary in character, has the same inalienable right to be heard in his defense, especially in instances like the present, of mere constructive contempt, as he would against a charge of murder or any other crime. On this subject it is said in Rapalje on Contempts, section 111: "Contempt of court is of two kinds— that which is committed in open court, and that which is committed out of the view and hearing of the court. For the punishment of the first, by commitment and fine, no proceeding need be taken contradictorily with the offender, but for the punishment of the latter, by the same means, the offender must be allowed to offer evidence and argument in his defense, otherwise any judgment which the court may pronounce will be absolutely void."

In *State v. Orleans Civil Judges*, 32 La. Ann. 1256, 1262, considering a case of constructive contempt, it is said: "The charge of contempt should not in any case be followed by sentence and imprisonment unless after a rule to show cause has been granted, and the party defendant therein heard and permitted to offer evidence and argument." And it is held that anything less than that would constitute a want of "due process of law," or a proceeding not in accord with the "law of the land," rendering the judgment void. And the court there quote with approval this justly celebrated definition of the phrase "law of the land" formulated by Mr. Webster in the Dartmouth College case: "By law of the land is most clearly intended the general law, which hears before it condemns, which proceeds from inquiry and renders judgment only after trial. The meaning is, that every citizen shall hold life, liberty, property, and immunities under the protection of general rules which govern society."

And in the very recent case of *Hovey v. Elliott,* 167 U. S. 409, decided by the supreme court of the United States, where, in a civil action, the court had stricken out the answer of a party because of his contempt of an order requiring him to pay money into court, and rendered judgment against him *pro confesso,* it was held that the act was beyond the power of the court, for the reason that it deprived the party of the right to be heard in his defense; and that the judgment so entered against him was void, even as against collateral attack. Among other things it is there said: "Can it be doubted that due process of law signifies a right to be heard in one's defense? If the legislative department of the government were to enact a statute conferring the right to condemn the citizen without any opportunity whatever of being heard, could it be pretended that such an enactment would not be violative of the constitution? If this be true, as it undoubtedly is, how can it be said that the judicial department, the source and fountain of justice itself, has yet the authority to render lawful that which if done under the express legislative sanction would be violative of the constitution? If such power obtains, then the judicial department of the government, sitting to uphold and enforce the constitution, is the only one possessing a power to disregard it. If such authority exists, then, in consequence of their establishment to compel obedience to law and enforce justice, courts possess the right to inflict the very wrongs which they were created to prevent."

And, as showing that it is not sufficient that the court shall go through the mere form of citing a party to appear upon the pretense of giving him a hearing while in fact denying him the right in its substance, it is there said: "Until notice is given, the court has no jurisdiction in any case to proceed to judgment, whatever its authority may be by the law of its organization over the subject matter. But notice is only for the purpose of affording the party an opportunity of being heard upon the claim or the charges made; it is a summons to him to appear and speak, if he has anything to say, why the judgment sought should not be rendered. The denial to a party of the benefit of a notice would be in effect to deny that he is entitled to notice at all, and the sham and deceptive proceeding had better be omitted altogether. It would be like saying to the party,

appear and you shall be heard; and, when he has appeared, saying, your appearance shall not be recognized, and you shall not be heard." And, quoting from *Galpin v. Page*, 18 Wall. 350, it is said: "It is a rule as old as the law, and never more to be respected than now, that no one shall be personally bound until he has had his day in court, by which is meant until he has been duly cited to appear and has been afforded an opportunity to be heard. Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and can never be upheld where justice is justly administered."

These considerations make it manifest that petitioner at his trial in the court below was denied that "due process of law" requisite to a valid conviction; and for that reason the order convicting him of contempt must be annulled.

It is so ordered.

Garoutte, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment annulling the order under review. The case is a very close one; but I think that the alleged contempt rested ultimately upon the asserted fabrication and publication by petitioner of false testimony and his persistency in restating this version of the same as true. This being so, he should have been allowed to introduce such evidence as he had to the point that his publication of the testimony was a fair and correct statement of it. The court declined to hear any evidence from him on that subject; and the weight of authority is to the point that this ruling, being a denial of appellant's right to make a defense, goes to the jurisdiction and is reviewable on *certiorari*. If petitioner had been allowed to introduce the offered evidence the case would have presented no difficulties.

BEATTY, C. J., concurring.—A cause being on trial in the superior court, a newspaper publishes what purports to be a portion of the testimony of one of the parties to the action.

The attention of the judge being called to the publication, he pronounces it grossly false from his seat on the bench. The publisher in the next issue of his paper, and while the cause is

still on trial, reasserts the correctness of his report and in coarsely vituperative terms retorts upon the judge the accusation of falsehood. Is this a contempt of court?

The answer to this question depends, it seems to me, upon the further question, whether or not the judge, in denouncing the original report, was acting in a judicial capacity.

A true report of the proceedings of a court is not a contempt. A false report may or may not be a contempt according to circumstances. If a false report is published under such circumstances as to constitute a contempt, there is but one way to deal with the matter judicially, and that is by a regular citation or attachment and a hearing. If the court or judge undertakes to act upon the matter in any other way, his action is extrajudicial and not in his official character.

Such, it seems to me, was very clearly the case here. The attention of the judge being drawn to this publication, it was natural, and no doubt commendable, that he, believing it to be gross perversion of the facts, should so characterize it, but in so doing he was not acting as a court or judge. What he said was in no sense a part of any judicial proceeding, and the fact that he was seated on the bench at the time makes the case no different in point of law from what it would have been if his remarks had been delivered on the street or communicated in writing to the same or another newspaper.

The report of the newspaper was, therefore, not an attack upon the court or an interference with the proceedings of the court, but was an attack upon the man, for which, if it was malicious and unfounded, he had the same, and no other, means of redress that the law gives to every citizen who is the victim of a libel. The facts alleged and found in the proceeding against the petitioner do clearly establish a malicious libel, but they do not, in my opinion, constitute a contempt of court, and for that reason I concur in the judgment annulling the order.

HARRISON, J., dissenting.—Section 1209 of the Code of Civil Procedure declares that any unlawful interference with the proceedings of a court is a contempt of the authority of the court; and when facts are presented to the court which could under any circumstances have interfered with its proceedings

in the trial of a cause, it has jurisdiction to investigate the charge of contempt.

No question as to the general power of the court is presented in the present case. Its jurisdiction to investigate a charge of contempt is not denied. Whether it had jurisdiction to investigate the charge against the petitioner does not depend upon any review of evidence, but is to be determined by the sufficiency of the affidavit upon which the citation to him was issued. If the facts set forth in that affidavit are sustained, its power to punish for the contempt therein charged follows as a legal conclusion. That the affidavit of Mr. Jones sets forth facts sufficient to give to the court jurisdiction to inquire into the alleged contempt, and to determine whether the acts charged against the petitioner had been committed by him, cannot be questioned, and the regularity of the procedure by which he was brought before the court is not challenged. The court, therefore, had jurisdiction to investigate the charge, and, after its jurisdiction had been thus acquired, any error by it in the course of the inquiry, either in admitting or in excluding evidence, is not the subject of review in this proceeding; and its finding of the facts upon which it based its judgment that the petitioner was guilty of contempt is also final.

It is claimed, however, by the petitioner, that the court had no jurisdiction to punish him for the contempt charged without giving him an opportunity to be heard in his defense, and that inasmuch as it refused to receive evidence which he offered at the hearing in support of certain matters which he had set up in his answer as a defense to the charge, and refused to consider these matters, it exceeded its jurisdiction in determining that he was guilty of the contempt charged in the affidavit. The right of one charged with contempt to be heard in answer to the charge is fully conceded; but upon this, as upon any other charge, his right to be heard is limited to matters that are pertinent to the issue before the court. If he is allowed a hearing upon these matters, he cannot say that he is deprived of his rights without due process of law. The provision in section 1217 of the Code of Civil Procedure that the court or judge must "investigate the charge, and must hear any answer which the person arrested may make to the same, and may examine witnesses

for or against him," does not require the court to hear an answer whose allegations have no tendency to exonerate the person from the charge, or to permit an examination of witnesses upon matters that are not relevant to the alleged contempt. The court is to conduct the investigation under the sanction of its judicial obligations, but its determination therein will not be set aside upon the ground that it committed error in the course of the investigation. If the court had refused to allow the petitioner to file any answer to the charge, or if, after permitting his answer to be filed, it had ordered it to be stricken from the files, and had refused to receive any evidence on his behalf in defense of the charge, its judgment against him would have been unauthorized. Instead of so doing, however, the court permitted the petitioner to file such answer as he desired, and also heard all the evidence which he chose to offer in support of the matters therein which were material or relevant to the defense.

In his answer the petitioner had alleged that the original publication of the proceedings was a correct statement of the testimony given before the court, and the refusal of the court to allow evidence in support of this averment is claimed by him to have been a denial of the right to be heard in his defense; but the truth or falsity of this publication was not involved in the charge of contempt before the court. The contempt with which the petitioner was charged did not consist in this publication, but in the subsequent effort on his part to compel the court to accept it as the truth in opposition to its own statement that it was not correct. A false publication of the proceedings of a trial does not of itself constitute a contempt, or render its author liable to punishment. The charge of contempt against the petitioner was the fact that after the court had stated that the testimony contained in that publication had not been given, and while the cause was still in process of trial before it and undetermined, the petitioner had published in his newspaper, in a manner calculated to destroy the freedom of the court in determining the rights of the parties to the controversy then before it for determination, that this judicial declaration was false.

The court, therefore, very properly refused to permit the truth or falsity of the publication to be made an issue of fact

in the proceedings upon the charge of contempt; and it also properly denied the offer of the defendant to introduce the evidence given at the trial of the cause of *Talmadge v. Talmadge,* relating to other matters than those involved in the publication. Such evidence could have no bearing or relevance to the matter then under investigation.

The case of *Talmadge v. Talmadge* was on trial before the court without a jury. The court was required to make its findings of fact upon the testimony given before it, and to render its judgment in accordance with that testimony. When its attention was drawn to this publication, with a request by one of the attorneys in the case to be informed whether that was the testimony as understood by the court, and it stated from the bench in reply that such testimony had not been given, and that the publication was incorrect, this was a declaration by it that its decision was not in any way to be affected by what was stated in the publication to have been given as testimony in the case. If either of the parties had felt that the court was in error, it would have been proper to point out to it in any competent mode—either by the notes of the stenographer or by the statement of one who had heard it—that such testimony had in fact been given. The court, however, would not have been bound to accept such statement as correct, but would still be compelled to decide the cause upon its own view of what was the testimony therein, leaving it to the defeated party to show in any proper mode that it had decided contrary to the evidence. It is manifest from a mere reading of the article published in the *"Bee"* that it would naturally tend to interfere with the proceedings of the court in the trial of the cause to which it referred, and that the court was authorized to find that it was an unlawful interference with its proceedings. The evident purpose, as well as the natural tendency, of the article in question was to compel the court to accept the facts given in the previous statement in the *"Bee"* as the correct version of that portion of the testimony in the case, and was an attempt on the part of the petitioner to coerce the court into deciding the cause upon testimony which in its opinion had not been given; and to the extent that this publication might tend to bring about that result, whether it did in fact effect the purpose or not, it was an unlaw-

ful interference with the proceedings of the court. If the cause had been on trial before a jury, and the petitioner had approached one of the jurors and made the statements contained in the article, it would not be questioned that he would have been guilty of contempt. It is none the less a contempt that the testimony was to be considered by the court instead of by a jury, nor is the act constituting the contempt diminished by the fact that it was published in a newspaper rather than stated orally. It was published with the evident purpose that it should be read, and it was in fact read by the judge while the cause was still pending before him and undetermined.

The defendant also alleged in his answer that the publication set forth in the affidavit of Mr. Jones was published without malice and for the purpose of defending himself against the false charges made against him by the judge, and that he then believed that the original publication contained a correct statement of the evidence in the case. At the hearing, after the court had declined to allow any evidence upon the correctness of the original publication, the defendant proposed to offer proof in support of the several matters contained in his answer. The court gave him permission to show that the publication was made without malice, and that he believed it to be true, and also that he believed that he had a right to publish it, and to state his motive therefor. The court also stated that, if he could do so, he might show that the original publication was made from a report compiled by a reporter of the *"Bee"* from the testimony which he had heard in court. The defendant declined to accept these offers, or to introduce any evidence upon these matters, his counsel saying: "We desire to put in our entire defense so that it may all go together." As the defendant was given an opportunity to present any evidence in his power relevant to the issue or material to his defense, it cannot be said that his trial was had contrary to the law of the land, or that he was convicted without a hearing.

The defendant's offer to prove by testimony that the publication did not interfere with the proceedings of the court was properly rejected. Whether the publication had such an effect or tendency was a question of law depending upon the nature of the publication and the circumstances under which it was

made, and was a question of law to be determined by the court, and not upon the testimony of witnesses.

The claim of the petitioner that by the article published he sought to justify himself against the implied charge of willful misrepresentation made by the court when its attention was first drawn to the statement of the testimony, falls to the ground in view of the fact that the court had made no reference to the petitioner, but assumed throughout its remarks that the publication had been made by reason of false and incorrect reports made by some one other than the petitioner. Whatever right the defendant might have to defend himself against what he deemed an unjust aspersion in these remarks of the judge, he had no right to do it in such a way as to interfere with the proceedings of the court. Unless courts are permitted to administer justice freely, and without being subjected to intimidation or coercion in their deliberations and decisions, they will be powerless to protect those who are injured, or to enforce the rights of those who invoke their aid.

It is contended by the petitioner that by reason of the following provision in section 1209 of the Code of Civil Procedure, as amended in 1891: "But no speech or publication reflecting upon or concerning any court, or any officer thereof, shall be treated or punished as a contempt of such court, unless made in the immediate presence of such court while in session, and in such a manner as to actually interfere with its proceedings," the court had no authority to adjudge him guilty of contempt. The effect of this provision was considered in *Shortridge's case*, 99 Cal. 526, 37 Am. St. Rep. 78, and it was said in that case: "No authority has been found which denies the inherent right of a court, in the absence of a limitation placed upon it by the power which created it, to punish as a contempt an act—whether committed in or out of its presence—which tends to impede, embarrass, or obstruct the court in the discharge of its duties. It is a doctrine which is admitted in all its rigor by American courts everywhere, and does not need the support of foreign authorities based upon the fiction that the majesty of the king, represented in the persons of the judges, is always present in the court. It is founded upon the principle, which is coeval with the existence of the courts and as necessary as the right of

self-protection, that it is a necessary incident to the execution
of the powers conferred upon the court, and is necessary to main-
tain its dignity, if not its very existence. It exists independent
of the statute. The legislative department may regulate the
procedure and enlarge the power, but it cannot, without trench-
ing upon the constitutional powers of the court and destroying
the autonomy of that system of checks and balances which is one
of the chief features of our triple department form of govern-
ment, fetter the power itself." (See, also, *Myers v. State*, 46 Ohio
St. 473; 15 Am. St. Rep. 638; *State v. Frew*, 24 W. Va. 416; *Ex
parte Barry*, 85 Cal. 603; 20 Am. St. Rep. 248; *People v. Dur-
rant*, 116 Cal. 179.)

It is, however, contended by the petitioner that the constitu-
tion has conferred upon the legislature the right to thus limit
the power of courts to punish for contempt of their authority.
This proposition is maintained by the following argument:
Section 1 of article XXII of the constitution provides: "That
all laws in force at the adoption of this constitution, not in-
consistent therewith, shall remain in full force and effect until
altered or repealed by the legislature." The chapter of the Code
of Civil Procedure relative to contempts was a law in force at
the adoption of the constitution, and, not being inconsistent
therewith, was, by virtue of this section, when the people voted
for and adopted the constitution, adopted by them as a part
and parcel of that instrument, and so continued until changed
by legislation; that the amendment of 1891, having been en-
acted under the power implied in the clause "until altered or re-
pealed by the legislature," is to be regarded as if the constitution
had conferred express power upon the legislature to thus limit
the power of the courts to punish for contempt. No such ef-
fect can be given, however, to the language of this section of the
constitution. The legislature derives no greater power of legis-
lation therefrom than is conferred upon it in article IV of the
constitution, nor is the judicial department of the state deprived
of any of its power by virtue of this section. The purpose and
effect of the section was not to change the character of the laws
therein referred to, or to give to them any different effect from
that which they previously had, but the section was placed in
the constitution for the purpose of avoiding any question of im-

plied repeal of any existing laws that were not inconsistent with the constitution, or, as is expressed in the preamble to the section, "That no inconvenience may arise from the alterations and amendments in the constitution of this state."

The order of the superior court should be affirmed and the writ discharged.

Temple, J., and Henshaw, J., concurred in the dissenting opinion.

Rehearing denied.