[Civ. No. 22022. Second Dist., Div. One. Apr. 22, 1957.]

J. C. COLLINS, Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

Herbert W. Simmons, Jr., for Petitioner.

Harold W. Kennedy, County Counsel, and Thomas H. Carver, Deputy County Counsel, for Respondent.

FOURT, J.— The respondent herein made a motion to have this court "recall the remittitur issued on January 3, 1957, and to correct the judgment filed on November 2, 1956, or in the alternative, to modify the opinion rendered in explanation of said judgment."

For the facts of the case, we quote verbatim from the opinion of November 2, 1956 (*Collins* v. *Superior Court*, 145 Cal.App. 2d 588 [302 P.2d 805]):

"Petitioner is the defendant in an action brought by one Bettye Lois Collins seeking a divorce from him or, in the alternative, an annulment of her marriage to him. Contemporaneously with the commencement of the action Bettye caused petitioner to be cited before the respondent court to show cause why he should not be ordered to pay to her reasonable sums for attorney's fees, court costs, alimony, and for the support of the minor child of the parties. Hearing was had upon the order to show cause on October 25, 1955, before a commissioner of the court, and on that day the commissioner in the presence of petitioner made a finding that petitioner had the ability to pay $80 per month for the support of the minor child of the parties. Under that same date he made written findings and recommendations to the court recommending that petitioner be ordered to pay through the court trustee the sum of $80 per month for the support of the minor child of the parties, payable at the rate of $20 per week on the first four Fridays of each month, the defendant to be credited upon such payments for payments made for the support of petitioner through the city attorney (order apparently had been made for the payment of $32 per month in a failure-to-provide proceeding before the city attorney); and that he be ordered to pay to counsel for Bettye the sum of $175, payable at the rate of $15 per month.

"On October 31 the court approved these findings and recommendations and made its order accordingly. This order was not made in the presence of petitioner, nor was it served upon him.

"On April 4, 1956, the action was tried as a default in the absence of petitioner; and on April 5, 1956, a decree annulling the marriage of Bettye and petitioner, and ordering petitioner to pay Bettye the sum of $80 per month for the support of

the minor child of the parties at the rate of $20 per week, payable on the first four Fridays of each month was filed; and on the 9th of April, 1956, this decree was entered. On July 2, 1956, petitioner filed in the respondent court an affidavit alleging that on April 4, 1956, the respondent court made an order that petitioner pay to the plaintiff for the support of the minor child the sum of $80 per month, payable at the rate of $20 per week on the first four Fridays of each month, and alleging that since the making of the said order the conditions and circumstances surrounding said parties had materially changed, and setting forth that petitioner had a net income of $260 per month and obligations of over $300 per month, and praying that the order of April 4 be modified so as to reduce the amount which the petitioner would be required to pay for the support of his child.

''Upon this affidavit an order was issued and served upon Bettye requiring her to show cause why the decree, insofar as it provided for payment by petitioner for the support of his child, should not be modified. On July 31, 1956, an order to show cause was issued by the respondent court directed to petitioner requiring him to show cause why he should not be adjudged guilty of contempt of court for willfully disobeying 'the Order heretofore made on the 4th day of April 1956' as more particularly described in the affidavit of the plaintiff, which was annexed.

''The affidavit of the plaintiff, which was the basis for the order to show cause, alleged in substance that on the 4th of April, 1956, the court had made the order which we have hereinbefore set forth as having been contained in the decree of annulment, that the petitioner had only made certain payments, which are set forth in detail in the affidavit and which totaled the sum of $79, and was delinquent in the sum of $253. It alleged that the defendant had the ability to make the payments in which he was delinquent but had willfully failed and refused so to do. It alleged that petitioner was not present when the order was made, and that the order was not pronounced in his presence; but in answer to the question set forth in the affidavit, 'What other knowledge of the Order has the adverse party received?' stated, 'Through his atty, and O.S.C. re modification filed by defendant herein shows actual notice.' It further stated that petitioner had sufficient income to comply with the order and that that income was in the sum of $260 per month net.

''On the same day an order to show cause issued requiring

petitioner to show cause why he should not be adjudged guilty of contempt for willfully disobeying the 'Order heretofore made on the 25th day of October 1955.' The affidavit filed by Bettye which was the basis for this order to show cause alleged that on the 25th of October, 1956,[1] the court had ordered petitioner to pay to plaintiff for the support of the minor child of the parties $80 per month payable on the first four Fridays of each month; that payments totaling $440 had accrued under said order; that there had been paid on account thereof the sum of $155 only; and that petitioner was delinquent in the sum of $285. The affidavit alleged that the order of October 25 was audibly pronounced in the presence of petitioner; and in answer to the question, 'What other knowledge of the Order has the adverse party received?' stated, 'Through his attorney.' It made the same allegations as to the ability of petitioner to support his minor child as were set forth in the affidavit heretofore mentioned.

"All orders to show cause were made returnable on August 21, 1956, and on that day the court apparently received some evidence upon the issues tendered by the order requiring Bettye to show cause why the order as to child support of April 4, 1956, should not be modified. After this evidence was taken, the court proceeded to determine the issues of contempt presented by the order to show cause directed to petitioner."

The petitioner was found guilty of contempt in each instance and sentenced to jail for five days on each charge, the sentences to run consecutively.

Respondent now contends that the judgment was an error of law because it exceeded the relief prayed for in the petition for the writ of certiorari and the order to show cause. The respondent asserts that the prayer of the petition for the writ of certiorari only asks that the court direct the respondent court to certify fully a transcript of the record and proceedings in the matter of the contempt proceedings. The prayer of the petition reads as follows:

"THEREFORE YOUR PETITIONER PRAYS:

"1. A Writ of Certiorari may be issued out of the above entitled Court directed to the said Superior Court of the State of California, In and for the County of Los Angeles and to the Honorable Joseph Raycraft, commanding the said Court to certify fully at a time and place to be specified in said Writ

---

[1] This is the date given in the affidavit, but all parties apparently understood it to refer to October 25, 1955.

of Certiorari, a transcript of the record and proceedings in said court in the matter of said order adjudging your petitioner guilty of contempt of said court and sentencing your petitioner guilty of contempt to serve ten days in jail, so that the same may be reviewed by this Court and thereupon the said Court to review said proceedings *an* annul said order adjudging your petitioner guilty of contempt of Court sentencing your petitioner to ten days in jail as aforesaid.

"2. That pending a determination of the merits of the contention of your petitioner that the order sentencing your petitioner to serve ten days in jail be stayed until further order of this court."

It is at once apparent that the respondent is incorrect in its contention, as the prayer does request an annulment of the order of contempt, which is exactly what this court ordered.

The respondent further asserts that the opinion is based on evidence not properly before the court in that this court considered a partial transcript filed by the petitioner and certified by the court reporter as being a true and correct partial transcript of the proceedings held in the matter. The partial transcript was not certified by the judge as being true and correct. It may be noted here that there was no objection at the time of the hearing to the use of the partial transcript, and everybody, including counsel for the respondent, apparently assumed that it was a true and correct partial transcript. The respondent has now furnished to this court a full and complete transcript of the entire proceeding, consisting of 35 pages. We have compared this full transcript with the partial transcript and find that the partial transcript is identical with pages 27-35 of the full transcript, with the exception of some very minor and insignificant changes, such as typographical corrections, which have no bearing on the meaning and sense of what was said and done.

The first 26 pages of the full transcript were not before us in the first instance, but a reading of the matter therein contained now does not tend, in any wise, to change our opinion as heretofore given. The substance of what was said and done, as related in the first 26 pages of the full transcript, is that the attorneys talked at length in the first instance about how they were to proceed about a stipulation having to do with the change of circumstances and its effect upon the introduction of evidence in the modification proceedings. Finally, the following was said:

"THE COURT: There is a contempt proceeding here that you are proceeding with as I understand.

"MR. STEPHENSON: The order to show cause in re modification.

"THE COURT: You are proceeding with the contempt matter?

"MR. STEPHENSON: Yes.

"MR. SIMMONS: My understanding is that the modification was filed first. I'd like the Court possibly to hear that first.

"MR. STEPHENSON: That's satisfactory.

"MR. SIMMONS: Take the stand."

J. C. Collins was then called as a witness in the proceeding having to do with his petition to modify the support allowance. He testified about his job, his living conditions and earnings. During cross-examination the following occurred:

"MR. STEPHENSON: While the defendant is on the stand, may I ask him some questions which would pertain to the contempt order, your Honor?

"THE COURT: Is that agreeable with you, Mr. Simmons?

"MR. SIMMONS: I'd rather finish the modification, if I could.

"THE COURT: You may because when it pertains to the contempt matter, of course, he may refuse to answer, to take the stand, if he wishes. It's quasi-criminal. Anything else?

"MR. STEPHENSON: I think not, but may I look this over just once more?"

It is fairly obvious that it was understood that the first part of the proceeding had to do with petitioner's request for a modification of the order for support and maintenance of the child, and counsel made it abundantly plain and clear that the contempt proceeding would come afterward, and the two were separate and apart and were not being considered as one proceeding.

Bettye Collins, the plaintiff in the action, testified that she was remarried and as to what her needs were for the child's support and maintenance. The order had theretofore been for $80 per month, and she stated that she could now support and maintain the child on $60 per month. Counsel for the plaintiff then announced "That's all on the question of modification, your Honor" indicating that he certainly had no thought that the proceedings up to that time had had anything to do with the contempt action. Afterward, the attorney for the petitioner cross-examined the plaintiff as to matters pertinent to the application for modification and counsel for the plaintiff again announced, "That's all on the modification." The court then asked, "Do you want to proceed on the contempt mat-

ter?" indicating that it had not, up until that time, been engaged in the proceeding on the contempt matter. The attorney for the plaintiff then asked the attorney for petitioner about stipulating to certain matters having to do with the contempt proceeding, and the attorney for petitioner stated, "I can't stipulate to anything, counsel."

The court took a recess and then resumed the session. The proceedings following the recess had to do with the contempt matter with which we are now concerned, and what was said and done is related and contained in the partial transcript which this court had before it at the time of the prior decision and reference to which has heretofore been made.

The pertinent parts of the partial transcript were quoted in the previous decision and are here set forth:

"THE COURT: Number 5 Collins, and you may proceed with the contempt.

"MR. STEPHENSON: We arrived at a stipulation which we feel will dispose of the matter of the contempt.

"We offer to stipulate that the amounts set forth as the arrearage in each of the contempt affidavits be found by the Court to be the amount in arrears as of July 31, 1956, on each order.

"THE COURT: July 31st?

"MR. STEPHENSON: Yes, and in other words, there would be then an arrearage of $285.00 on the order of October 25th, 1955, and an arrearage of $253.00 on the order of April 4th, 1956, for child support, and an arrearage of $135.00 as of that July 31st on the order for attorney's fees which was made on October 25, 1955.

"We further offer to stipulate that the Court need not find the defendant in contempt on these orders, but in lieu thereof the Court make an order now for the payment of these arrearages and whatever amount per month the Court feels is reasonable that the defendant should pay.

"MR. SIMMONS: We are willing to stipulate, your Honor. We would like to ask the Court to make note of the fact that the defendant has during this period of time in question paid either eight, seven or eight, and in a few instances $10.00 a week except for a few weeks.

"MR. STEPHENSON: I have the list here of payments that were made and they were fairly regular, your Honor.

"THE COURT: Do you wish to offer that list, Mr. Simmons?

"MR. STEPHENSON: I have no objection if you feel you'd like to offer it.

362

"MR. SIMMONS: It might be well to have it in the file.

"THE COURT: You are offering it, Mr. Simmons. It will be received.

"MR. SIMMONS: Stipulation that they are not my figures?

"MR. STEPHENSON: I stipulate.

"THE COURT: This list of payments received is received as Defendant's Exhibit A."

The court then orally announced its decision modifying the decree of annulment insofar as it provided for the support and maintenance of the child of the parties, and immediately, without taking any further evidence and without the affidavits of the plaintiff having been offered or received in evidence, proceeded to find the petitioner guilty of contempt. Counsel for the petitioner apparently was surprised at the course of events and asked if he might interrupt the court before the order was made, stating that he understood the contempts were dismissed by stipulation. Counsel for the petitioner then advanced the argument that there was no showing of service on the April 4th order, and thereupon the judge told him to "sit down and listen for a while. When we get all through, then if you don't like it, you take an appeal." The petitioner was then sentenced to five days in jail on each of the matters, the sentences to run consecutively. It was then called to the court's attention by petitioner's attorney, but to no avail, that the petitioner had been sick a part of the time in question and was off work, and that there was no evidence showing his ability to pay during that period of time. The court thereupon informed counsel that there was no evidence in the record of any illness and that his statement after judgment was such that he, the judge, would not consider it. Counsel pointed out further that all of the testimony taken was directed to the modification proceedings in any event, and that counsel was taken completely by surprise. The attorney for the petitioner attempted to explain to the court that no evidence had been introduced by the petitioner on the contempt matter and that he understood that the contempt hearing was to be separate and apart from the modification hearing. Our reading of the records leads us to the same conclusion.

The respondent has asserted that the transcript demonstrates that both orders to show cause, the modification and contempt proceeding matters, were heard simultaneously, and that the evidence was introduced as to both matters. We have set forth sufficient to indicate that there is no merit in such an assertion. Moreover, petitioner was not afforded an oppor-

tunity to examine the plaintiff as a witness in any contempt proceeding, and he had no opportunity to testify himself in any such proceeding.

The respondent also asserts that the affidavits of the plaintiff were received in evidence and the petitioner had the opportunity to cross-examine her and to offer evidence to excuse his delinquency. The record speaks for itself and we can find no place therein where the affidavits of plaintiff were received in evidence and the respondent has not referred us to the place or places in the record where such was done. We have set forth the testimony and statements of the various participants in the proceedings to show that the petitioner did not get the opportunity to examine the plaintiff on the contempt proceeding, and he was told in substance that he was too late as to any matter in excuse of any delinquency such as, for example, sickness and inability to work.

In our former opinion we stated, and we restate here:

"Proceedings such as this to have a person adjudged guilty of an indirect contempt because of a violation of an order of the court, although ancillary to the action in which the order which it is alleged the defendant has violated was made, are nevertheless quasi-criminal in character. (*Ex parte Ah Men,* 77 Cal. 198, 200 [19 P. 380, 11 Am.St.Rep. 263] ; *Mitchell* v. *Superior Court,* 163 Cal. 423 [125 P. 1061] ; *Ex parte Gould,* 99 Cal. 360 [33 P. 1112, 37 Am.St.Rep. 57, 21 L.R.A. 751] ; *Phillips* v. *Superior Court,* 22 Cal.2d 256, 257 [137 P.2d 838].)

"In order that the court may have jurisdiction to try one charged with contempt, the affidavit which initiates the proceeding must state the facts constituting the offense and must affirmatively show that the person charged with the contempt had knowledge of the order he is charged with violating (*Phillips* v. *Superior Court, supra,* at p. 258 ; *Warner* v. *Superior Court,* 126 Cal.App.2d 821 [273 P.2d 89] ), and the hearing had in the proceeding must be such as to constitute procedural due process (*Warner* v. *Superior Court, supra*).

"While no exact definition of due process may be formulated, it is established that due process is absent if a party is denied the right to have his cause tried and determined in accordance with the procedures that are applied in other cases of like character. (*San Jose Ranch Co.* v. *San Jose etc. Co.,* 126 Cal. 322, 326 [58 P. 824] ; *Gray* v. *Hall,* 203 Cal. 306, 317 [265 P. 246].) It implies the right not to be deprived of one's property or liberty without evidence having been offered against him in accordance with the established rules, and an

opportunity to cross-examine those whose evidence is given against him, and the opportunity to present evidence in his own behalf. (*McClatchy* v. *Superior Court,* 119 Cal. 413, 420 [51 P. 696, 39 L.R.A. 691]; *Matter of Lambert,* 134 Cal. 626, 633 [66 P. 851, 86 Am.St.Rep. 296, 55 L.R.A. 856]; *Langendorf etc. Bakeries* v. *Industrial Acc. Com.,* 87 Cal.App.2d 103, 104 [195 P.2d 887], and cases cited.)

"In the case at bar no evidence was offered against petitioner. ■ The affidavits upon which the orders to show cause were issued served as the complaint charging the contempt. They might also serve as evidence at the hearing but they did not constitute such evidence until offered and received by the court, and upon their being offered petitioner would have the right to object to any matter stated therein upon any proper legal ground as to its relevancy or competency. In the proceedings here he would also have the right, if the evidence was offered and received, to cross-examine the affiant (*Langendorf etc. Bakeries* v. *Industrial Acc. Com., supra;* 16A C.J.S. 834). ■ Without the affidavits' having been offered and without the petitioner having had a right to challenge the relevancy or the competency of the matter set forth in the affidavits, he was deprived of a trial of the issues tendered by the affidavits according to the rules and principles which have been established in our system of jurisprudence for the enforcement and protection of private rights. ■ It is true that the proceeding in contempt being ancillary to the annulment action, the court might take judicial notice of the orders it had made; but it could not take judicial notice of and assume as true the facts stated in the affidavits until the defendant had had the opportunity to challenge those facts as evidence, and when it did so it deprived petitioner of due process (*Moore* v. *California Minerals etc. Corp.,* 115 Cal.App. 2d 834, 837 [252 P.2d 1005]). Procedural due process being lacking, the judgments of contempt must each be annulled.

"As to the judgment finding petitioner in contempt of the order denominated as one of October 25, 1955, is concerned, the facts disclosed by the file of the respondent court in the annulment action negative the truth of the finding made in the judgment of contempt that the defendant had knowledge of that order; for while the affidavit which is the foundation for the order to show cause in that contempt proceeding states that the order was audibly pronounced in the presence of petitioner, the proceedings had in that matter and of which the court was charged with judicial notice show that the only

proceeding had on October 25 was a hearing before the commissioner who had no power to make any order, and that the actual order of the court was not made until October 31, 1955, and then was made in chambers by the approval of the recommendations of the commissioner. We advert to this phase of the matter not because it could in any wise affect the decision which we have necessarily come to, as heretofore announced, but because it has apparently been common practice to assume, contrary to the facts, that a party who is present at the hearing before the commissioner is charged with knowledge of an order thereafter made by the court. That this is not true follows not only from the fact that the commissioner has no power to order a party to do anything, but also from the fact that the court is not bound to make an order in accordance with the commissioner's findings or his recommendations.''

So far as this court is concerned, there is nothing to correct in the former judgment; it was, in our opinion properly based upon the record we had before us at that time, and now that the respondent has furnished us the full transcript, we are of the same opinion. If the respondent court is insistent upon putting the petitioner in jail for his derelictions, if any, it will be a simple matter to properly proceed, and if he is guilty of contempt, to act accordingly.

Respondent's motion to recall the remittitur and to correct the judgment is denied.

White, P. J., and Doran, J., concurred.