[S. F. No. 16174. In Bank.—October 16, 1939.]

HARRY R. BRIDGES, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

Gallagher, Wirin & Johnson, Gladstein, Grossman & Margolis, Charles J. Katz and A. L. Wirin for Petitioner.

J. H. O'Connor, County Counsel, Douglas De Coster, Chief Deputy County Counsel, S. V. O. Pritchard, Deputy County Counsel, Allen W. Ashburn, Michael G. Luddy and Arnold Praeger for Respondent.

CURTIS, J.—This proceeding was instituted for the purpose of reviewing a judgment of the Superior Court of the County of Los Angeles whereby the petitioner, Harry R. Bridges, was found guilty of contempt of court. Upon the filing of the petition herein, an order was made that the proceedings before the trial court be certified to this court in order that the same might be reviewed and such action taken therein as is by law required. The basis of the contempt proceeding was the alleged publication of a portion of a

telegram sent by petitioner to the secretary of labor which, it is claimed, contained statements calculated to, and which had an inherent tendency to, interfere with the proceedings of a certain action then pending before the Honorable Ruben S. Schmidt, a judge of the Superior Court of said County of Los Angeles. That action was entitled *P. W. Walker et al.* v. *International Longshoremen's Association, District Local 38–82, Inc. et al.* and carried the number, 420356.

The proceedings against petitioner involving said charge of contempt were commenced by the filing of four affidavits, each entitled, "In the Matter of H. R. Bridges, sometimes known as Harry R. Bridges. In Contempt", and were verified respectively by J. Louis Elkins, executive secretary of the Los Angeles Bar Association; L. E. Lampton, clerk of the Superior Court of the County of Los Angeles; Charles E. Sharritt, and A. G. Stanham, deputy county clerks of said court. After proceedings duly had, the petitioner appeared in said court, filed an answer to the charge made against him in said affidavits and the matter was heard by the Honorable Edward T. Bishop, a judge of said superior court. At the close of said hearing, the petitioner herein was found guilty of contempt of court upon the second count set forth in the affidavit of J. Louis Elkins, and not guilty as charged in the third count of said affidavit. The trial court had theretofore sustained a demurrer of petitioner to the charge as set forth in the first count of said affidavit. In adjudging the petitioner herein guilty of contempt of court, the trial court made findings of fact which we set out in full as follows:

"That on or about the 18th day of September, 1937, an action was commenced in the above entitled court by the filing of a complaint and the issuance of a summons entitled, 'P. W. Walker et al., plaintiffs, v. International Longshoremen's Association—Local 38–82, Inc., a corporation et al., defendants', which said action is known as action number 420356 in said court.

"That said action was tried in the above entitled court before the Honorable Ruben S. Schmidt, as judge thereof, and on the 21st day of January, 1938, the said Ruben S. Schmidt, as judge of said court, made, signed and filed his findings of fact and conclusions of law in said action.

"That thereafter, but on the same day, a judgment and permanent injunction in said action were made and filed, in

and by the terms of which a receiver was appointed over said International Longshoremen's Association, Local 38–82, Inc., and said receiver on said date qualified by filing a bond required by said judgment to be filed by him, and by making and filing his oath as such receiver.

"That on the next day, to-wit, the 22nd day of January, an order was made and entered by the court, staying the execution of said judgment and said injunction to the 29th day of January, 1938; that said judgment and permanent injunction were entered by the clerk of this court, on the 24th day of January, 1938, in the judgment book kept by him for that purpose, and that on said date all the defendants in said action, against whom judgment had been rendered and said permanent injunction issued, made and served a notice of intention to move for a new trial and a notice of motion to vacate the judgment and decision in said action.

"That from the time of the filing of said action, to and including the time of the events hereinafter referred to, the existence of said action and of the controversy involved therein received wide and general publicity in the Pacific Coast states of the United States of America. That almost daily during said period news items respecting the controversy involved in said action, and respecting conditions in the maritime industry on the Pacific Coast as a result of said controversy, appeared in the daily newspapers published and circulated in the City of Los Angeles, and that the existence of said controversy and of the fact that the said controversy was pending in the courts for determination was a matter of great public interest and general public discussion.

"That on the 24th day of January, 1938, the defendant Harry R. Bridges dispatched a telegraphic message to Frances Perkins, Secretary of Labor in the Cabinet of the President of the United States, at Washington, D. C., which telegram contained words and figures as follows, to-wit: 'This decision is outrageous considering I. L. A. has 15 members (in San Pedro) and the International Longshoremen-Warehousemen Union has 3000. International Longshoremen-Warehousemen Union has petitioned the labor board for certification to represent San Pedro longshoremen with International Longshoremen Association denied representation because it represents only 15 men. Board hearing held; decision now pending; Attempted enforcement of Schmidt decision will tie-up port of Los Angeles and involve entire Pacific Coast.

International Longshoremen-Warehousemen Union, representing over 11,000 of the 12,000 longshoremen on the Pacific Coast, does not intend to allow state courts to override the majority vote of members in choosing its officers and representatives and to override the National Labor Relations Board.' That the words 'this decision' and the words, 'Schmidt decision', as used in the telegram, referred to the judgment and permanent injunction in which was contained an order appointing a receiver, as hereinabove noted. That the initials 'I. L. A.' referred to in said telegram, referred to International Longshoremen's Association, Local 38–82, Inc., hereinabove referred to.

"That at or about the time of the sending of said telegram the defendant Harry R. Bridges caused a copy thereto to be given to one James D. O'Neil, for the purpose and with the intent that the contents of said telegram should, and would be, furnished to and published in newspapers on the Pacific Coast and elsewhere, and said James D. O'Neil did give said telegram to newspaper reporters, and on the 24th and 25th days of January, 1938, the portion of said telegram above set forth was published in newspapers of wide and general circulation in the cities of San Francisco and Los Angeles, in the State of California, and the sending of said telegram and the contents thereof were thus made public and received wide and general publicity in the County of Los Angeles and elsewhere.

"That the statements contained in said telegram, and the publication of the fact of the sending of said telegram, and the publication of the contents thereof, all as aforesaid, were in and of themselves calculated, and had, an inherent tendency to interfere with the orderly and due administration of justice in said action No. 420356, and to interfere with, influence, sway, and control the proceedings in said action, and to embarrass and influence the actions and decisions of the judge before whom said action was pending."

As we view the proceeding before us, it involves three major questions which call for answers. There are also questions of minor importance which will be discussed briefly at the close of this opinion. These three questions are: first, one of procedure, second, the constitutionality of the last sentence of subdivision 13 of section 1209 of the Code of Civil Procedure, and third, whether the petitioner was responsible for the publication of the telegram sent to the

secretary of labor, or that portion thereof which found its way into the public press, and if so, was the subject-matter thereof of such a character that the publication thereof would subject petitioner to punishment for contempt of court?

At the inception of the proceeding against petitioner, he objected to the procedure by means of which he was brought before the court and prosecuted on the charge of which he was subsequently found guilty. As we have seen, this proceeding was initiated by the filing of four affidavits each of which was entitled, "In the Matter of H. R. Bridges, sometimes known as Harry R. Bridges. In Contempt." Upon these affidavits being filed, the trial court issued its order and directed petitioner to show cause why he should not be punished for contempt. The petitioner appeared, and both by motion to quash the order to show cause and by demurrer, raised the procedural question and contended that the proceeding against him was a criminal proceeding and should have been brought in the name of the People of the State of California, as plaintiff, and prosecuted by the district attorney of the county, or the attorney-general of the state, instead of being entitled as indicated above, and prosecuted as it was by three private attorneys purporting to represent the Los Angeles bar association. Both the motion and demurrer were held to be without merit, and accordingly the motion was denied and the demurrer was overruled. The petitioner thereupon filed a verified answer to the charge against him, and the case was then set for trial upon the issues made by said answer and the affidavits of Elkins, and others. Before trial of said cause, the petitioner filed a demand for a jury to try said issues, which demand was denied, and said trial was held and the cause decided by the court without a jury. Petitioner therefore contends that said proceedings were fatally defective, (1) because they were not entitled and prosecuted in the name of the People of the State of California, (2) because they were prosecuted by private attorneys and not by the district attorney of said county of Los Angeles, or by the attorney-general of the state, and (3) because petitioner was denied a jury trial.

We shall first direct our attention to the first of these three questions, that is, as to the procedure followed in this proceeding by which petitioner was charged, prosecuted and found guilty of contempt of court in the manner stated

above. We find that both the Penal Code and the Code of Civil Procedure contain provisions defining certain acts which they respectively denounce as contempts of court. By section 166 of the Penal Code it is provided that every person guilty of contempt of court of the kinds therein enumerated is guilty of a misdemeanor. Section 1209 of the Code of Civil Procedure provides that certain acts or omissions in respect to a court of justice enumerated therein are made contempts of court. There is a general similarity between acts set forth in either of these code sections to those embraced in the other although in some respects the provisions of one of said sections differ from those contained in the other. ██ Undoubtedly proceedings against a person charged with contempt of court under the provisions of the Penal Code should be entitled and prosecuted in the name of the People of the State of California, and by their authority. (Art. VI, sec. 20, Const. of California.) By section 1211 of the Code of Civil Procedure it is provided that, ''When the contempt is not committed in the immediate view and presence of the court, or of the judge or justice at chambers, an affidavit shall be presented to the court, judge, or justice, of the facts constituting the contempt.''
██ Provisions are made by section 1212 of the Code of Civil Procedure for process to bring the accused person before the court where a trial is had before the court. The person charged may challenge the judge of the court before whom he is brought for trial under section 170 of the Code of Civil Procedure. In the proceeding under review herein, the petitioner herein challenged Judge Schmidt under said section of the code, and by stipulation of the parties to said proceeding, the trial of said contempt proceedings was had before Judge Bishop of said superior court. In said proceeding, the procedure provided by the sections of the Code of Civil Procedure above cited was followed rather than that applicable to strictly criminal prosecutions.

██ It is the position of the petitioner that the proceeding against him is a criminal prosecution, and therefore should be entitled, ''The People of the State of California'', and should be conducted in the name and by the authority of the People as provided by article VI, section 20, of the Constitution, which reads as follows: ''The style of process shall be,

'The People of the State of California,' and all prosecutions shall be conducted in their name and by their authority."

If therefore the contempt proceeding against petitioner was strictly a "criminal prosecution", it should have been entitled in the name of the People and prosecuted by their authority, that is, it should have been entitled not only in the name of the People but should also have been conducted by the duly constituted prosecuting officers of the county in which the action was tried.

The precise character of a proceeding in contempt of court under the sections of the Code of Civil Procedure cited above and similar statutes of other states has received frequent attention from the court of this and other jurisdictions.

*In re Morris,* 194 Cal. 63 [227 Pac. 914], was a *habeas corpus* proceeding brought to test the validity of petitioner's conviction of the charge of contempt of court. The petitioner had been prosecuted under the provisions of the Penal Code and found guilty as charged. He contended that his imprisonment under the judgment of conviction in said action was illegal for the reason that the court had no jurisdiction to punish him for contempt of court under the provisions of the Penal Code, as the exclusive jurisdiction to punish for contempt of court was vested in the court whose order petitioner was charged with violating. After reviewing certain features of the case, the court stated (p. 68), "From these premises petitioner deduces the conclusion that the jurisdiction to punish as a contempt the violation of an order issued by the superior court of Sacramento County is vested solely and exclusively in that court. If we were to regard petitioner's act solely as an offense against the dignity and authority of that court, we would agree with this conclusion, and the cases so hold. [Citing cases.] But these cases do not hold that when an act which is a contempt of court is at the same time a specific criminal offense, denounced as such in the Penal Code, it will not be punishable as such. It was the plain intent of the legislature expressed in the cited code sections to give a double aspect to the wrongful acts there enumerated. In one aspect they are to be regarded as offenses against the dignity and authority of the court, remediable in accordance with the rules prescribed in the Code of Civil Procedure. In the other aspect they are to be regarded as offenses against the peace and dignity of the state of California, and remedia-

ble as such in accordance with the rules prescribed in the Penal Code. . . . Plainly the legislature did not intend to take away from the court contemned the power to punish a violator of its orders, but intended rather to provide an additional remedy which should be in a sense cumulative, and which should be available in the court's possessing the appropriate criminal jurisdiction. These remedies were not intended to be concurrent, but rather cumulative in character. . . . '' That case quotes with approval the following statement of the law from the Supreme Court of Montana (p. 71), '' 'When prosecuted under the Code of Civil Procedure, a contempt of court is not to be regarded as a criminal offense to be prosecuted only by complaint, information, or indictment, as laid down by Section 8 of Article III of the state Constitution, but, rather, as a special proceeding of a criminal character . . . Furthermore, the same acts which may be punished in the summary proceeding are characterized by the lawmaking power as criminal, and the additional remedy by an ordinary criminal action is provided for in Penal Code, Section 293.' (This is the same as our Penal Code Section 166.)'' (*State* v. *Clancy,* 30 Mont. 193 [76 Pac. 10].)

The Supreme Court of Montana has further held that, ''When prosecuted under the Code of Civil Procedure, a contempt of court is not to be regarded as a 'criminal offense' to be prosecuted only by complaint, information or indictment as laid down by Section 8, Article III of the State Constitution, but, rather, as a special proceeding of a criminal character—in that sense, it is a public offense, yet it is not one prosecution for which is exclusively controlled by the constitutional limitations circumscribing methods of prosecution of strictly criminal offenses.'' (*State* v. *District Court,* 24 Mont. 33 [60 Pac. 493].)

The court in *In re Morris, supra,* page 70, also cites the case of *Bessette* v. *W. B. Conkey Co.,* 194 U. S. 324, 330 [24 Sup. Ct. 665, 48 L. Ed. 997], wherein is to be found the following statement: ''A contempt proceeding is *sui generis*. It is criminal in its nature, in that the party is charged with doing something forbidden, and if found guilty, is punished. Yet it may be resorted to in civil as well as criminal actions, and also independently of any civil or criminal action.''

The precise point here involved was before the Supreme Court of Illinois and it was stated, ''Section 33 of Article 6

of the Constitution provides that all prosecutions shall be carried on: *in the name and by the authority of the People of the State of Illinois, and conclude: Against the peace and dignity of the same"*. The court then held, "The word, 'prosecutions' as used in the constitutional provision invoked, signifies only prosecutions of a public or criminal character and concerns the formal accusation of offenders by present-ment or indictment by a grand jury or by information. (*State of Illinois* v. *Froelich*, 316 Ill. 77 [146 N. E. 733].) Contempts are not crimes within the meaning of the statute defining misdemeanors. . . . The particular constitutional provision has no application to a proceeding to punish for contempt." (*People* v. *Jilovsky*, 334 Ill. 536 [166 N. E. 108]. See, also, *In re Nevitt*, 117 Fed. 448; *McDougall* v. *Sheridan*, 23 Idaho, 191 [128 Pac. 954]; *State* v. *American-News Co.*, 62 S. D. 456 [253 N. W. 492].)

The Supreme Court of the United States in *In re Debs*, 158 U. S. 564, at page 596 [15 Sup. Ct. 900, 39 L. Ed. 1092], makes the following statement, "In brief, a court, enforcing obedience to its orders by proceedings for contempt, is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to."

While in some decisions we find the direct statement made that a contempt proceeding is a criminal action, we find no authority which holds that a proceeding instituted by affi-davit under a statute similar to the sections of the Code of Civil Procedure of our state relating to "contempts" has been held to be violative of the constitutional provision re-quiring all criminal prosecutions to be in the name of the People of the state and by their authority, while the cases are legion in which proceedings of that character have been sus-tained. In this state this court has invariably sustained such proceedings. (*In the Matter of Tyler*, 64 Cal. 434 [1 Pac. 884]; *Ex parte Karlson*, 160 Cal. 378 [117 Pac. 447, Ann. Cas. 1912D, 1334]; *In re Shuler*, 210 Cal. 377 [292 Pac. 481]; *In re San Francisco Chronicle*, 1 Cal. (2d) 630, 636 [36 Pac. (2d) 369]; *In re Arnold*, 204 Cal. 175 [267 Pac. 316]; *Blodgett* v. *Superior Court*, 210 Cal. 1 [290 Pac. 293, 72 A. L. R. 482].)

In the San Francisco Chronicle case this court held as fol-lows: "Under this section [Subdivision 7, Section 166, Penal Code] the act prohibited is both a contempt and a misde-

meanor. The mere fact that the legislature has seen fit to declare such a contempt also a misdemeanor in no way deprives the court of the power to punish such act as a constructive contempt in a summary proceeding such as this.'' Our conclusion therefore is that contempt proceedings instituted under the provisions of the Code of Civil Procedure of this state are not strictly criminal actions but are special proceedings of a criminal character, and as such they are not within, nor governed by, the requirements of section 20, article VI of the Constitution of this state. They are not thereby required to be brought in the name of the people of the state, nor prosecuted by their authority. Section 1211 of the Code of Civil Procedure is not at variance with said section of the Constitution. Section 1211 provides for the institution of said proceedings by affidavit, and contains no requirement that they be prosecuted by the authority of the people. █ In proceedings of this nature, the rule is well settled that, ''It is a matter of no importance who institutes the proceedings for contempt, since the alleged contemner is not prejudiced in his defense by the particular mode in which the facts are brought to the attention of the court''. (13 Cor. Jur., Contempt, sec. 82, p. 60.) In the present instance, the proceedings were, as we have seen, instituted by the filing of an affidavit by the executive secretary of the bar association of the county of Los Angeles, a committee of three attorneys from said association acting as counsel in behalf of affiant. Thereafter the trial court appointed said attorneys to continue as counsel in the further prosecution of said proceeding. The procedure here followed was in all substantial respects like that approved in the case of *Freeman* v. *City of Huron,* 8 S. D. 435 [66 N. W. 928], where the court held: ''Believing the course adopted in the court below was warranted by abundant authority, and that it did not tend to prejudice the accused in respect to any substantial right, we hold that there was no reversible error in the manner entitling the affidavit and other papers, and that there was no error in allowing counsel, other than the state's attorney to conduct the prosecution.''

█ On the trial of the accused upon the charges made against him, he demanded a jury trial which was denied him by the trial court. Petitioner contends that he had the constitutional right to trial by jury. Section 1217 of the Code

of Civil Procedure provides otherwise, that is, for a trial before the court in which the proceeding is pending. No authority in this state is cited by the petitioner in support of his present contention. It has been the universal practice in this state from its earliest history to try proceedings in contempt by the court without a jury. Scores of cases have been before this court in which the accused has been tried and convicted of contempt as a result of trials by the court alone, and in not a single instance to which our attention has been called was the point ever raised that the accused was entitled to a trial by jury. "A respondent in contempt proceedings is not entitled to a trial by jury except where a jury trial is expressly provided for by statute, and then only in the particular cases to which the statute applies. The fact that the act constituting contempt may also be an indictable offense does not affect the rule where the proceeding is not by indictment. The power of the court to punish summarily for contempt has existed from the earliest period of the common law and is not within the application of constitutional provisions guaranteeing a trial by jury, or providing against depriving persons of their liberty without due process of law." (35 Cor. Jur., Juries, sec. 99, p. 194. See, also, 16 R. C. L., p. 205, and cases cited in 48 Am. Dec. 192; *O'Brien* v. *People,* 216 Ill. 354 [75 N. E. 108, 108 Am. St. Rep. 219, 3 Ann. Cas. 966]; *O'Flynn* v. *State,* 89 Miss. 850 [43 So. 82, 119 Am. St. Rep. 727, 11 Ann. Cas. 530, 9 L. R. A. (N. S.) 1119]; *State* v. *North Shore Boom Co.,* 67 Wash. 317 [121 Pac. 467, Ann. Cas. 1913D, 458].) Finally, upon this point, we quote from the Debs case, *supra,* where the court, at page 594, states, "But the power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court. And this is no technical rule. In order that a court may compel obedience to its orders it must have the right to inquire whether there has been any disobedience thereof. To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency."

We might also consider under the question of the proper procedure to be followed in proceedings of this character, the contention of petitioner that the affidavit accusing

petitioner of contempt of court contains in some instances statements upon information and belief. While it is held in *Ex parte Roth,* 3 Cal. App. (2d) 226 [39 Pac. (2d) 490], that an affidavit based *solely* on information and belief without stating any authentic source of information is not an affidavit of facts prescribed by section 1211 of the Code of Civil Procedure and is insufficient as a basis of jurisdiction to support a warrant or order to show cause or a judgment in a proceeding in constructive contempt, the appellate court in *In re Simoniello,* 6 Cal. App. (2d) 425 [44 Pac. (2d) 402], pointed out that the Roth decision had failed to cite and was in conflict with the decision of this court in the case of *Golden Gate Consolidated Hydraulic Min. Co.* v. *Superior Court,* 65 Cal. 187 [3 Pac. 628], and refused to follow the same. It is not contended that all or even the principal allegations in the accusatory affidavit against petitioner were made on information and belief, and therefore the Roth case, even if accepted by us, would not be controlling. However, we are satisfied with the statement of the law as expressed in the case of *Golden Gate Consolidated Hydraulic Min. Co.* v. *Superior Court, supra,* as it appears to us that the reasoning therein is more logical and persuasive than that contained in the Roth case. The contention that the affidavit against petitioner gave the trial court no jurisdiction over him in the contempt proceedings by reason of the fact that it contained allegations made upon information and belief cannot therefore be sustained.

We now pass to the second of the three major questions which we perceive are presented in this proceeding, and that is the question of the constitutionality of the last sentence of subdivision 13 of section 1209 of the Code of Civil Procedure reading as follows: "But no speech or publication reflecting upon or concerning any court or any officer thereof shall be treated or punished as a contempt of such court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings."

In the case of *In re San Francisco Chronicle,* 1 Cal. (2d) 630 [36 Pac. (2d) 369], the constitutionality of this provision of said section was squarely before the court, and after an extended examination of the authorities, we held unequivocally that said provision of said section invaded the constitutional

powers of the courts, and was, therefore, of no validity. After setting forth the contention of the respondents that, under the provisions of section 1209, subdivision 13 of the Code of Civil Procedure, the publication of any article (whatever its contents) not in the physical presence of the court should not be treated as a contempt, this court on page 634 of the opinion held as follows: ''The foregoing contention requires but brief consideration. That portion of section 1209 above quoted has many times been held unconstitutional on the ground that the courts have inherent power to punish for contempts, whether of a direct or constructive nature, and that the legislature cannot constitutionally infringe on that power. (*In re Shuler,* 210 Cal. 377, 397 [292 Pac. 481]; *McClatchy* v. *Superior Court,* 119 Cal. 413 [51 Pac. 696, 39 L. R. A. 691]; *Lamberson* v. *Superior Court,* 151 Cal. 458 [91 Pac. 100, 11 L. R. A. (N. S). 619]; *In re Lindsley,* 75 Cal. App. 122 [241 Pac. 934]; *Lindsley* v. *Superior Court,* 76 Cal. App. 419 [245 Pac. 212]; see, also, *In re Arnold,* 204 Cal. 175 [267 Pac. 316]; *Blodgett* v. *Superior Court,* 210 Cal. 1 [290 Pac. 293, 72 A. L. R. 482]; *In re Shortridge,* 99 Cal. 526 [34 Pac. 227, 37 Am. St. Rep. 78, 21 L. R. A. 755].) What was said by this court in *Briggs* v. *Superior Court,* 211 Cal. 619 [297 Pac. 3], in no way affects the rule above enunciated. It was therein held that the legislature may, in the case of a constructive contempt, provide for the procedure by which such contempt shall be tried and punished, but that case did not hold that the legislature can determine what shall constitute a constructive contempt, or declare that certain acts shall not constitute a constructive contempt. There is obviously a fundamental difference between a statute merely regulating procedure, as was involved in the Briggs case, and one such as section 1209, *supra,* purporting to affect the power of the courts to punish for contempt.''

Ordinarily this citation from so recent a decision in which the prior rulings of this court are set forth in great detail would be considered a sufficient refutation of and a complete answer to the contention of petitioner that by the provisions of this section of the Code of Civil Procedure, he is shielded from prosecution for the publication of said telegram notwithstanding the contemptuous character of said publication. In attempting to sustain the constitutionality of said provision of the Code of Civil Procedure, and to overcome the ar-

ray of authorities cited in our opinion in the San Francisco Chronicle case, petitioner cites no decision of this court, or any other appellate court of this state, supporting his theory of the law. On the other hand, he concedes that the rule of law enunciated in our former decisions, and reaffirmed so positively and definitely in the San Francisco Chronicle case, and other recent cases, is now and for years past has been the law in the state respecting publication of articles contemptuous in their character, even though not made in the presence of the court. He insists, however, that the courts of this state are fundamentally wrong in declaring said provision of the Code of Civil Procedure invalid as an invasion of the constitutional powers of the courts, and insists that we should rewrite the law applicable to the power of the court to summarily punish for indirect contempt, and in the revised version, hold that courts under the common law had no inherent power to punish for indirect or constructive contempt—that is, for acts committed without the immediate view and presence of the court; that his lack of power descended to the courts of this country, and, therefore, it always has been and is now within the power of the legislature, not only to provide for the procedure by which constructive contempts shall be tried and punished, but also to determine what acts shall constitute constructive contempts, and further to declare that certain acts shall not constitute constructive contempts. In support of the proposal to have the law of constructive contempt rewritten, he has taken us back to a period in English jurisprudence antedating the time of Blackstone. He has seized upon the decision of the ancient case of *Rex* v. *Almon,* 97 English Reprints, 94, and labeled it as the progenitor of a long line of spurious offspring that have infested the courts of both this and the mother country until recent investigation has revealed the irregularity of its birth and the falsity of its doctrine. It is even claimed that the author of the Almon opinion was responsible for the statement in Blackstone that, ''The process of attachment, for these and the like contempts, must necessarily be as ancient as the laws themselves. For laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power, therefore, in the supreme courts of justice to suppress such contempts, by an immediate attachment of the offender, results from the first principles of judi-

cial establishments, and must be an inseparable attendant upon every superior tribunal." (Jones's Blackstone, Book IV, sec. 320.) In the language of an illustrious member of the Supreme Court of the United States (Justice Holmes in *Gompers* v. *United States,* 233 U. S. 604, 611 [34 Sup. Ct. 693, 58 L. Ed. 1115, Ann. Cas. 1915D, 1044]) this suggestion "opens up vistas of antiquarian speculation", which while interesting to follow, in the end is productive of no beneficial result. From what appears to be most reliable sources, the opinion in *Rex* v. *Almon, supra,* was prepared by Justice Wilmot, then a justice of the King's Bench. He was afterwards Chief Justice of the Court of Common Pleas. While prepared probably about the year 1765, and during the period when Blackstone was delivering his famous course of lectures which thereafter were compiled by him in his Commentaries, this opinion was never adopted by the court or filed as the decision of the case in which it was prepared due to the fact that the case was abandoned before final judgment. It was never made public until the year 1802, some thirty-seven years after its preparation, and therefore years after Blackstone's famous Commentaries were published and in common use. It is surmised by those attacking the doctrine of this decision that because Blackstone and Wilmot were close friends, they conferred together and probably discussed the question involved in the Almon case and that Blackstone was induced by Wilmot to accept the latter's theory of the law of the inherent power of the court in matters of contempt, and so stated it in his Commentaries as quoted above. To now hold upon mere surmise that Blackstone relied upon the author of the opinion in the Almon case, and therefore his statement of the law should be discredited, would be extending the doctrine of "antiquarian speculation" beyond all reasonable limits.

But even conceding that petitioner's claims respecting the authority upon which Blackstone based his statement are true, it cannot be disputed that the views expressed by him were then the law in England and continued to be for years thereafter. When the Wilmot opinion in the Almon case was published in 1802, it only strengthened the rule announced by Blackstone. For a long list of cases from the various English courts, extending over a period of time beginning in 1821 and including the year 1925, in which Wilmot's doctrine is applied

or in which Almon case is cited with approval, see "Contempt of Court", by Sir John Fox, page 30.

Courts in this country followed the rule adopted by the English courts, and previous to any statute limiting their power, held practically without exception that they had the inherent power to summarily punish for contempt acts committed without their view or presence. However, by act of Congress enacted in the year 1831 (Rev. Stats., sec. 725; Jud. Code, sec. 268; U. S. C. A., Title 28, sec. 385) it was provided that, "The said courts [United States Courts] shall have power to punish by fine or imprisonment at the discretion of the court, contempts of their authority. Such power to punish for contempts shall not be construed to extend to any cases except misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice." This statute was followed by legislation in several of the states in which similar restrictions were attempted to be placed upon the courts of their respective states. This legislation was at first generally sustained by the courts. However, in 1918, the Supreme Court of the United States, notwithstanding the existence of the statute of 1831, sustained the conviction of the editor of a newspaper upon a charge of contempt of court based upon the publication of certain articles in said newspaper. (*Toledo Newspaper Co.* v. *United States,* 247 U. S. 402 [38 Sup. Ct. 560, 62 L. Ed. 1186].) The effect of this decision was to declare inoperative and ineffective for any purpose the limitation attempted by Congress to be placed on the power of the court to summarily punish for an indirect contempt, that is, to punish an act committed without the view and presence of the court. This decision has been followed generally by the United States courts. (*Francis* v. *People of Virgin Island,* 11 Fed. (2d) 860, 863–865; *In re Independent Pub. Co.,* 240 Fed. 849; *United States* v. *Providence Tribune Co.,* 241 Fed 524; *United States* v. *Markewich,* 261 Fed. 537; *United States* v. *Sanders,* 290 Fed. 428.)

The Supreme Court of the state of Arkansas had, previous to the decision in the Toledo Newspaper Co. case, held that the legislature was without power to limit the jurisdiction of the courts to punish for acts of contempt committed without the presence of the court. (*State* v. *Morrill,* 16 Ark. 384.) During and since the reassertion by federal judges of summary power as to publications, the courts of the following states,

seventeen in number, have sanctioned the rule announced in the Toledo Newspaper Co. case—Alabama, Arizona, Connecticut, Florida, Georgia, Idaho, Indiana, Maryland, North Dakota, Oklahoma, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, and Virginia. The courts of eight other states have expressed views which indicate that they are in harmony with the rule announced by the Supreme Court of the United States. They are Iowa, Kansas, Minnesota, Mississippi, Nevada, Oregon, Wisconsin, and Wyoming. We have already shown the attitude of the courts of this state upon this question. In a few states the subject seems not to have been considered. Only four states out of the forty-eight states of the Union seem definitely committed to a contrary doctrine. They are Pennsylvania, New York, South Carolina and Kentucky. In each of these states, the statutes in question are over one hundred years old. (For a further discussion of this subject and the authorities cited in support of the foregoing statements see 28 Columbia Law Review, p. 542.) From the foregoing it will appear that the overwhelming weight of authority in this country supports the decision of this state rendered in the San Francisco Chronicle case, and those cited in that opinion. While we commend the diligence and industry displayed by counsel in their investigation and consideration of the subject, we find ourselves unable to agree with them in their contention that the legislature may limit the power of the court to summarily punish for contempt acts committed without the view and presence of the court. The last sentence of subdivision 13 of section 1209 of the Code of Civil Procedure above quoted is unconstitutional on the ground that the courts of the state have inherent power to punish for contempt whether of a direct or constructive nature, and the legislature cannot infringe on that power.

■ In considering the third major question presented by the record in this proceeding, it is important that we keep in mind the nature of the particular proceeding before us, and not confuse it with the ordinary appeal from a judgment, nor with an original proceeding in contempt before a trial court. On petition to review the judgment of the trial court, it is definitely settled that the sole question before the reviewing court is one of jurisdiction of the trial court to render the judgment under review. If it be determined that in the rendition of said judgment the trial court acted within its

jurisdiction, then the inquiry ends, and the only order the reviewing court is authorized to make is one affirming the proceedings of the trial court. On the other hand, should it appear from the record as certified to us that the court either had no jurisdiction to pronounce said judgment, or exceeded its jurisdiction in doing so, then the proceedings should be annulled. (Sec. 1075, Code Civ. Proc.) Other than as just indicated, the writ of *certiorari* will not be granted to review errors of law (*People* v. *Latimer*, 160 Cal. 716 [117 Pac. 1051]), or mere questions of fact. (*White* v. *Superior Court*, 110 Cal. 60 [42 Pac. 480].) ▮ However, in passing upon the question of the trial court's jurisdiction, the reviewing court may consider the evidence before the trial court for the purpose of determining whether it was sufficient to give that court jurisdiction to render its judgment finding the accused guilty of contempt, and in case the court finds that the evidence is insufficient to sustain the conviction it will annul the judgment. (*McClatchy* v. *Superior Court*, 119 Cal. 413 [51 Pac. 696, 39 L. R. A. 691], *Hotaling* v. *Superior Court*, 191 Cal. 501, 506 [217 Pac. 73, 29 A. L. R. 127], and *Titcomb* v. *Superior Court*, 220 Cal. 34, 44 [29 Pac. (2d) 206].) But in such a case, the review of the evidence is limited to determining whether there was any substantial evidence before the trial court to sustain its jurisdiction. The power to weigh the evidence rests with the trial court. (*Daily* v. *Superior Court*, 4 Cal. App. (2d) 127, 134 [40 Pac. (2d) 936]; *McFarland* v. *Superior Court*, 194 Cal. 407 [228 Pac. 1033]; *In re Brambini*, 192 Cal. 19 [218 Pac. 569]; *Strain* v. *Superior Court*, 168 Cal. 216, 223 [142 Pac. 62, Ann. Cas. 1915D, 702]; *White* v. *Superior Court*, 110 Cal. 60, 64 [42 Pac. 480]; *Imperial Water Co.* v. *Board of Supervisors*, 162 Cal. 14 [120 Pac. 780].) ▮ There is nothing contrary to this rule to be found in *In re Buckley*, 69 Cal. 1, 3 [10 Pac. 69], nor in *Hotaling* v. *Superior Court, supra*, or in any other case to which our attention has been called, as all of those cases were original proceedings before this court. In proceedings of that nature, the same rule that governs the trial court in contempt proceedings is applicable to this or any appellate court at the hearing of contempt proceedings originally brought in such courts. It has repeatedly been held that an accused on trial for contempt must be proved guilty beyond a reasonable doubt. But such rule, as will be seen

from the authorities cited above, has no application in a proceeding such as the one before us, to review the judgment of the trial court in finding the accused guilty of contempt.

In considering the evidence before the trial court in the light of the rule just stated, it is our sole duty to determine whether such evidence is of sufficient substantiality to support the judgment of conviction, or as stated in *Daily* v. *Superior Court, supra* (p. 124): "In the proceeding before us, the extent of our power is to inquire whether there was any evidence before the trial court sustaining its jurisdiction."

The evidence in this matter is comparatively simple. The case of *Walker* v. *International Longshoremen's Association, District Local 38–82, Inc.*, No. 420356, mentioned in the first paragraph of this opinion, was in fact a contest between the American Federation of Labor, hereinafter referred to as the A. F. of L. and the Committee for Industrial Organization, hereinafter referred to as the C. I. O., over the possession of the hiring hall maintained at San Pedro, California, for the longshoremen at said port. Petitioner was the president of the International Longshoremen's and Warehousemen's Union, a C. I. O. organization, the jurisdiction of which organization extended to all its subsidiary unions on the Pacific Coast. While not a party to said action, petitioner, as the president of the C. I. O. organization on this coast, was directly and vitally interested in the result thereof, and was particularly interested in seeing that the defendant prevailed in said action. The action was tried, and the court ruled in favor of the plaintiffs in said action, and appointed a receiver to have charge of the hiring hall, which, as we have seen, was the subject of the controversy between the parties thereto. The action was one which attracted great public interest and to which the newspapers of the county of Los Angeles and other parts of the state gave wide and extensive publicity. The judgment in said action was rendered on January 21, 1938. The petitioner was then in San Francisco, and on January 24th, from his headquarters in that city he dictated to his stenographer a telegram to the secretary of labor and gave a copy thereof to James D. O'Neil, a trained newspaper man of more than twenty years' standing, who was in charge of the publicity bureau maintained by the petitioner as the executive officer of the C. I. O. in the city of San Francisco. O'Neil gave a copy of said telegram to one of the city

papers of San Francisco and on that day and the following day that portion of the telegram set forth in the findings of the trial court was published in the metropolitan papers of the cities of San Francisco and Los Angeles and elsewhere in this state.

Upon this evidence the trial court found, "That at or about the time of the sending of said telegram, the defendant, Harry R. Bridges, caused a copy thereto [thereof] to be given to one James D. O'Neil for the purpose and with the intent that the contents of the said telegram should, and would be furnished to and published in the newspapers on the Pacific Coast and elsewhere." It is contended by petitioner that the evidence does not support said finding. In discussing the evidence respecting the publication of said telegram, the trial court reasoned as follows: "He [the petitioner] dictated it to his stenographer, his secretary, and told her to send it. There you have an express command. But if you do not [have] an express command respecting publicity, you are going to have publicity, because of the telegram itself. In dictating that telegram to his secretary, he did not need to tell her in words to send it, and certainly she knew when she sent the telegram what to do with a copy of it, because it was an established custom. When the copy of that telegram was put in the hands of a man, who is in the organization for the purpose of giving the telegram—which is a news story in anybody's language—publicity, it was just the same as sending it direct to the newspapers."

We are in entire agreement with the conclusion reached by the trial court in holding the petitioner responsible for the publication of said telegram. Mr. O'Neil testified that he handled the publicity of the C. I. O. for the West Coast and had an office three doors from the reception room of the C. I. O. in San Francisco, and four doors from Mr. Bridges' office; that Mr. Bridges "was news wherever he goes", that he (O'Neil) handled the publicity of telegrams released or received by Mr. Bridges, that copies of all telegrams "that had anything to do with the C. I. O., most of them came to my desk", and that he then determined whether any particular telegram was newsworthy and susceptible of being sent to the press for publication. We think that there can be no doubt from the testimony of Mr. O'Neil that petitioner not only had every reasonable ground to believe that his telegram

would be given to the public press for publication but that the regulations of his organization made it the duty of O'Neil to see that the papers were apprised of the telegram in order that publicity might be given to its contents. In our opinion, there was ample evidence to sustain the finding of the trial court that petitioner gave to O'Neil the copy of the telegram sent to the secretary of labor with the intent that the contents thereof would be furnished to and published in the newspapers on the Pacific Coast and elsewhere.

Finally petitioner contends that his act in publishing the telegram, even conceding that he was responsible for its publication, did not constitute a contempt of court. He claims in the first place that the final judgment in the action of *Walker* v. *International Longshoremen's Association* had been entered some days prior to the publication of said telegram and therefore the action to which he referred in his telegram was no longer pending. In assuming that the Walker action had been finally disposed of, and was therefore no longer pending, petitioner is in error. The time for moving for a new trial in said action had not yet expired, and until the action had reached that stage, it cannot be said that it had ceased to be a pending action in that court. (Sec. 1049, Code Civ. Proc.) The case was still before Judge Schmidt at the time of, and long after, the publication of said telegram.

This brings us to the question whether the publication of that portion of the telegram set out in the findings, respecting the decision of Judge Schmidt, while the action in which said decision was rendered was pending, constituted a contempt of court. It is not necessary for us to restate the contents of the published article in full. It contains the following statements: "This decision is outrageous." "Attempted enforcement of Schmidt decision will tie up port of Los Angeles and entire Pacific Coast." "International Longshoremen's & Warehousemen's Union, representing over 11,000 of the 12,000 longshoremen on the Pacific Coast, does not intend to allow state courts to override majority vote of members in choosing its officers and representatives." The published statement was not only a criticism of the decision of the court in an action then pending before said court, but was a threat that if an attempt was made to enforce the decision, the ports of the entire Pacific Coast would be tied up. Fur-

thermore, it contained a direct challenge to the court that 11,000 longshoremen on the Pacific Coast would not abide by its decision. When these statements are considered in connection with the extensive publicity that had already been given to the pending action, and the prominent position of the petitioner as the executive officer of an organization to which 11,000 longshoremen on the Pacific Coast belonged, we think that there can be no question that their publication in the metropolitan papers on the Pacific Coast, and particularly those in the county of Los Angeles in which said court was held, tended materially to affect the orderly administration of justice in the case to which reference was made and which was then pending in said court. If such would be the effect of such publication, and in our opinion, that was its effect, then the act of publishing such statements was a contempt of the court in which such action was pending. (*In re Shuler, supra; In re San Francisco Chronicle, supra; Bee Pub. Co.* v. *State,* 107 Neb. 74 [185 N. W. 339]; *State of Nebraska* v. *Lovell,* 117 Neb. 710 [222 N. W. 625]; *Toledo Newspaper Co.* v. *United States, supra; People* v. *Wilson,* 64 Ill. 195 [16 Am. Rep. 528] (in which case this court cited with approval in the San Francisco Chronicle case); *Patterson* v. *Colorado,* 205 U. S. 454 [27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689]; *Sinclair* v. *United States,* 279 U. S. 749, 764 [49 Sup. Ct. 471, 73 L. Ed. 938, 63 A. L. R. 1258].)

In these cases it was held that if the publication or act in question had a ''reasonable tendency'' to interfere with the orderly administration of justice in pending actions before judicial tribunals, it amounted to a contempt of court and might be punished as such. The Patterson case, *supra,* clearly states that the test to be applied in determining whether a party is guilty of contempt is whether the act complained of had a ''reasonable tendency'' to interfere with the orderly administration of justice. The opinion in that case was written by Mr. Justice Holmes and was cited with approval in the Shuler case (*In re Shuler, supra,* p. 403), and this court quoted from that case, as follows (p. 462): ''In the next place, the rule applied to criminal libels applies yet more clearly to contempts. A publication likely to reach the eyes of a jury, declaring a witness in a pending cause a perjurer, would be none the less a contempt that it was true. It would tend to obstruct the administration of justice, be-

cause even a correct conclusion is not reached or helped in that way, if our system of trials is to be maintained. The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

"What is true with reference to a jury is true also with reference to a court. Cases like the present are more likely to arise, no doubt, when there is a jury and the publication may affect their judgment. Judges generally, perhaps, are less apprehensive that publications impugning their own reasoning or motives will interfere with their administration of the law. But if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward such an interference, it may punish it as in the instance put. When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied."

In the case of *Sinclair* v. *United States*, 279 U. S. 749 [49 Sup. Ct. 471, 73 L. Ed. 938, 63 A. L. R. 1258], a somewhat similar statement was made by the court, but in language as follows (p. 764): "But the situation is controlled by the reasonable tendencies of the acts done, and not by the extreme and substantially impossible assumptions on the subject. Again, it is said that there is no proof that the mind of the judge was influenced or his purpose to do his duty obstructed or restrained by the publications and therefore there was no proof tending to show the wrong complained of. But here again not the influence upon the mind of the particular judge is the criterion but the reasonable tendency of the acts done to influence or bring about the baleful result is the test. In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the judge to resist acts of obstruction and wrongdoing by him committed as a prelude to trial and punishment for his wrongful acts."

Further on in the opinion, the court reiterates that, "The reasonable tendency of the acts done is the proper criterion." While this opinion was written by Justice McReynolds, it was concurred in by Justice Holmes. We mention Justice Holmes' participation in these two cases, as petitioner has cited opinions by this illustrious jurist, probably a majority of which were dissenting opinions, simply to show that while in other cases upon apparently different statements of fact, Justice Holmes has expressed certain conclusions upon which petitioner relies in support of this contention that the "reasonable tendency of the act done" is not the proper criterion to be applied in such cases, at least in these two cases, Justice Holmes has approved the "reasonable tendency" criterion.

We have called particular attention to these cases from the Supreme Court of the United States, in addition to those from our own court, for the reason that petitioner contends that the "reasonable tendency" doctrine is not the true test to be applied in determining whether the act done constituted contempt of court, and in support of his contention, he has cited opinions, both majority and dissenting, to be found principally in the Reports of the United States Supreme Court. The tests which are mentioned in various of these opinions, any one of which petitioner insists is the only true and proper test, and should, therefore, be applied in this case, are referred to by different judges as the "inherent and dangerous tendency", the "clear and present danger", and "the actual obstruction principle". It is sufficient to say in answer to petitioner's contention that none of these tests has been applied by the courts of this state, and that neither the Patterson nor the Sinclair case, which are in accord with the decisions of the courts of this state, has been overruled by the court in which they were rendered. We are, therefore, content to rest our decision upon the "reasonable tendency" test in determining whether the publication or act done constituted a contempt of court. The application of this test to the publication by petitioner of that portion of said telegram recited in the findings of fact of the trial court, clearly renders said publication a contempt of court.

Petitioner relies with much earnestness upon his constitutional right of free speech to justify his publication of the quoted portion of the telegram sent by him to the secretary of labor. A large number of pages of the briefs in

behalf of petitioner are devoted to the right of an individual to freely speak his views and to the importance of this constitutional right of free speech. It may be conceded that all that has been said in these briefs as to the importance of the right of free speech and of a free press in a democracy meets with the approval of this court. In fact, we are in thorough accord with petitioner's claim that the right of free speech and of a free press are among the greatest bulwarks of the freedom which, as citizens of this country, we enjoy. But as was said in a recent decision of the Supreme Court of the United States, "The right [of free speech] is not an absolute one, and the State in the exercise of its police power may punish the abuse of this freedom." (*Stromberg* v. *California,* 283 U. S. 359, 368 [51 Sup. Ct. 532, 75 L. Ed. 1117, 73 A. L. R. 1484].)

This contention of petitioner that he is protected in the publication of said telegram by the constitutional right of freedom of speech is in our opinion completely answered by what we said in *In re Shuler, supra,* at page 402: "The constitutional guaranties of freedom of speech and of the press do not, in our opinion, and in the light of the authorities which we are about to cite, go so far as to protect the citizen in making such comment by either spoken or written utterances with respect to causes pending before courts of justice, as have for their purpose and manifest tendency an attempted interference with the orderly administration of justice before such tribunals and in respect to causes pending and in course of conduct therein." In that case, as in the case now before us, the petitioner attempted to justify his animadversions of the court by the claim that his utterances were protected by the right of free speech. In an opinion concurred in by all the members of this court we held that his claim was without merit. The same conclusion must be followed in this action respecting petitioner's claim of immunity.

In addition to the three questions hereinbefore discussed, petitioner has raised other questions which may be regarded as of minor importance but which are of sufficient consequence to require answers.

He contends that as he did not personally cause said telegram to be published he is not liable for criminal contempt for the act of his agent in publishing the same without his direction. If the evidence supported the facts recited in this

statement, we would have no hesitancy in sustaining said contention. But as we have seen, the trial court found that petitioner caused his agent to make said publication, and we have held that this finding is supported by substantial evidence in the record. Petitioner having directed the publication of said telegram by his agent, is personally liable for any infraction of the law due to said publication equally with his agent.

 Petitioner further contends that the sending and publication of said telegram by him as a labor official to the secretary of labor respecting labor matters is protected by the constitutional guarantee to engage in a lawful occupation. We thoroughly agree with petitioner that the sending of a telegram to the secretary of labor was within his constitutional rights, and one might go further and hold that it was within his duties as the executive head of the union affected by the decision of Judge Schmidt to inform the secretary of labor of said decision, but he was not charged nor punished for the sending of the telegram. It was the publication of the telegram in the manner hereinbefore set forth, and not the sending of it, that constituted the offense of which he was found guilty.

 Finally petitioner contends that the trial court exceeded its jurisdiction in adjudging petitioner guilty of contempt of court because it had no jurisdiction to make the order in the original action out of which action the alleged contempt arose. This contention is based upon what petitioner conceives to be the legal effect of federal legislation establishing the National Labor Relations Board and conferring upon that board certain powers respecting labor disputes. We do not understand that that legislation has taken from the state court jurisdiction of disputes of the nature of that involved in the case of *Walker* v. *International Longshoremen's Association* which was pending before Judge Schmidt's court. Petitioner has cited in support of this last contention the case of *Fur Workers Union No. 72* v. *Fur Workers Union,* 105 Fed. (2d) 1 [70 App. D. C. 122], decided by the United States Court of Appeals, District of Columbia, on March 27, 1939. We find nothing in the decision of that case which tends to support the contention of petitioner that the Superior Court of the County of Los Angeles was without jurisdiction to hear or decide the issues

involved in the *Walker* v. *International Longshoremen's Association* case. .

In considering the questions herein discussed we had access, not only to the able briefs and arguments of counsel in this case, but also those in the two cases, entitled, *The Times-Mirror Co., a Corporation, et al.* v. *Superior Court*, and numbered respectively L. A. 16928, and L. A. 16929, now before us on petitions to review judgments of contempt. All three of these cases were argued with the understanding that both the arguments and briefs filed in any one of said cases either by the respective parties or by *amici curiae* might be used by the court in the decision of any one or more of the other cases. It was in pursuance of this understanding that we have had the benefit of the argument and briefs of the Times-Mirror cases in this decision of the present one.

For the reasons herein stated we are of the opinion that the proceeding adjudging petitioner guilty of contempt of court must be affirmed.

It is therefore ordered that the judgment of the trial court be and the same is hereby affirmed.

Shenk, J., Nourse, J., *pro tem.*, Waste, C. J., and Houser, J., concurred.

EDMONDS, J., Dissenting.—The charge against the petitioner is that he published a statement concerning Judge Schmidt and the merits of a case which had not been finally decided. But the legislature has declared that "no speech or publication reflecting upon or concerning any court or officer thereof shall be treated or punished as a contempt of such court unless made in the immediate presence of such court while in session and in such manner as to actually interfere with its proceedings" (sec. 1209, Code Civ. Proc.) is constitutional. This law, passed in 1891, expresses the constitutional guarantees of free speech and a free press and should be upheld.

The California statute upon this subject is in substantially the same form as those of many other states. Unquestionably the legislative purpose has been to prevent abuses of uncontrolled power. However, such enactments, with few exceptions, have been swept aside as unconstitutional efforts to trench upon judicial authority. These decisions are posited

upon the assumption that the right to hold one guilty of either a direct or a constructive contempt, summarily and without a jury trial, is "inherently necessary" to judicial administration and is founded upon "immemorial usage" at common law. Yet neither the declarations of the courts in support of their dignity and independence, nor the enactments of legislative bodies upholding freedom of speech and the press, have settled the seemingly irreconcilable conflict. Whenever vital issues affecting the public interest are presented for adjudication, and editors or citizens of positive views comment upon either the facts of a case or the principles which are claimed to govern the result, the question whether a judge may punish for contempt usually arises, Phoenix-like, from the ashes of earlier controversies.

Modern legal scholars have made an extended study of the principles upon which the law of contempt by publication rests, and conclude that much of what has been judicially relied upon as authority to punish for such an act is fiction. The writers of an exceptionally well-considered article in the *Columbia Law Review*, after a most thorough investigation, assert that the rules of the common law do not support the claims which have been made for them. (Nelles and King, Contempt by Publication in the United States, 28 Col. L. Rev. 401, 525.) In short, it now appears that in this branch of the law, the courts have built a structure of judicial reasoning upon the sands of precedents which do not exist.

The first enactment upon the subject of contempts was that of the statute of Westminster (13 Ed. 1, c. 39) which was adopted seventy years after the date of Magna Charta. This statute concerns contempts in resisting the process of the King's courts, a class defined by Blackstone as "consequential contempts," and it seems most unlikely that this legislation would have been enacted if the power to punish such offenses constituted a part of the law of the land which existed so long before Magna Charta as to be considered a maxim of jurisprudence. In any event, the first newspapers were established three hundred and fifty years after the date of Magna Charta, and the offense of contempt by publication must, therefore, be of much later origin.

Early in our own national history the question whether one might be summarily punished for a constructive contempt was presented by a case in Pennsylvania which arose out of the

campaign for ratification of the federal Constitution. A newspaper editor named Oswald, who was the leader of the opposition to ratification, was arrested for a libel. He countered in the columns of his newspaper with the charge that the prosecution was prompted by political motives, and for this publication he was ordered to show cause why he should not be attached for contempt. In support of the attachment, counsel relied upon Blackstone and a *dictum* in *Roach* v. *Garvan*, 2 Atkyns, 469 (1742), which was a decision by the English Court of Chancery not based upon any common law precedent. (See Fox, Contempt of Courts, p. 22.) Chief Justice McKean of Pennsylvania, in deciding the case, stated that "proceeding by attachment is as old as the law itself and no act of the legislature, or section of the Constitution, has interposed to alter or suspend it" and he concluded that since the Constitution guaranteed trial by jury only "as heretofore", the summary procedure was proper. (*Respublica* v. *Oswald*, 1 Dallas, 319 [1 L. Ed. 155, 1 Am. Dec. 246].)

According to Blackstone's *Commentaries*, either "speaking or writing contemptuously of the Court or Judges, acting in their judicial capacity" or "printing false accounts of causes then pending in judgment" was punishable by immediate attachment. In such a proceeding, Blackstone said, the court's power "results from the first principles of judicial establishments and must be an inseparable attendant upon every superior tribunal". (4 Blacks. Com. 284 et seq.) Largely upon the authority of Blackstone's views, the Pennsylvania court concluded that summary process and trial was proper in all contempt proceedings. Oswald was fined and imprisoned, but upon his release he memorialized the legislature for the impeachment of the justices of the Supreme Court. After consideration of the charges, a resolution was adopted denying articles of impeachment. Later a proposal to define the nature and extent of contempts was introduced in the legislature, but the measure was defeated by a Federalist majority. (See note to *Respublica* v. *Oswald*, *supra*, p. 329 et seq.)

The concept of freedom of the press, stated by Blackstone, is completely foreign both in time and place to the fundamental principles of American institutions. The doctrine that "the liberty of the press . . . consists in laying no *previous* restraints upon publications and not in freedom from censure for criminal matter when published" (5 Blacks. Com. 151)

is a statement of the British law at a time when seditious libel was punishable as a crime; it is not the interpretation of a Constitution. Moreover, that law has been very differently declared in the last one hundred and twenty-five years. (See Chaffee, Freedom of Speech, (1920) 8 et seq.)

It now appears probable that Blackstone's notions of "immemorial usage" concerning the authority of a court to summarily punish for contempt by publication were based upon the draft of an "opinion" in *The King* v. *Almon* written by Wilmot, J., about 1765, three or four years before the publication of the Commentaries. (See Fox, Contempt of Courts, p. 21.) A rule *nisi* had been obtained to attach John Almon, a bookseller, for publishing a libel on the Chief Justice, Lord Mansfield, and after argument Wilmot prepared an opinion. In answer to the contemnor's claim that summary procedure by attachment was inappropriate, he stated: "The power which the courts in Westminster Hall have of vindicating their own authority is coeval with their first foundation and institution; it is a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt to the court, acted in the face of it, 1 Ventris I, and the issuing attachments by the supreme courts of justice in Westminster Hall for contempts out of court stands upon the same immemorial usage as supports the whole fabric of the common law; it is as much the *lex terrae* and within the exception of Magna Charta as the issuing of any other legal process whatsoever. . . . And though I do not mean to compare and contrast attachments with trials by jury, yet truth compels me to say that the mode of proceeding by attachment stands upon the very same foundation and basis as trial by juries do—immemorial usage and practice. (Wilmot's Notes, p. 254.)" (Fox, *supra*, pp. 7, 8.)

The proceeding against Almon was aborted by a procedural defect and was subsequently abandoned with a change of ministry; consequently, Wilmot's decision was never delivered. However, almost forty years later it was published with his other papers, and has been cited and relied upon as a correct statement of the law ever since. Sir John Fox comments upon it as follows: "Never pronounced in court, this extrajudicial opinion did not possess the binding effect of a decision, but it acquired the singular distinction of becoming a leading authority by citation and approval in sub-

sequent cases, the earliest of which was decided fifty-six years after the opinion was written. No higher testimony to Mr. Justice Wilmot's reputation for learning and ability could be given than this, that his opinion was adopted by succeeding judges without question and without examination of earlier authorities.'' (Fox, *supra,* p. 8.)

Here is one of the strangest stories in the history of the law. The most remarkable part of it is that the earlier authorities, with the exception of the decisions of the Star Chamber, required prosecution by indictment, presentment and arraignment for contempts committed by ''strangers'' to the court, and the contemnor was entitled to a trial by jury. (See Solly-Flood: ''Prince Henry and Chief Justice Gascoigne,'' Transactions of the Royal Historical Society, vol. 3, N. S., p. 47; Fox, *supra,* p. 227 et seq.) But Blackstone followed the posthumous views of his friend Wilmot, and the Supreme Court of Pennsylvania in the Oswald case based its decision upon a doctrine which was historically incorrect. Thus the opinion of an English judge in an undecided case was given the authority of a precedent in the new country.

A decade later the same question was reviewed in the case of *Bayard* v. *Passmore,* 3 Yeates (Pa.), 438, 440. Passmore, by posting a notice in the exchange room of the city tavern, denounced his adversary in a pending appeal as ''a liar, a rascal and a coward''. For this he was attached for contempt and was found guilty and sentenced to fine and imprisonment. The controversy then passed from the court to the legislature, but by this time the Federalists were in a minority, and articles of impeachment were preferred against the three Federalist judges who had found Passmore guilty. In the state senate the vote was 13 to 11—two votes short of the necessary two-thirds for impeachment. (See Nelles and King, *supra,* p. 414.) But shortly afterward a statute was passed restricting the judicial power over contempts to its true historic limits: (1) official misconduct of court officers; (2) disobedience of process; and (3) misbehavior in the actual presence of the court which actually obstructs the administration of justice. (1808–1809 Pa. Acts, ch. 78, p. 146.) Although the statute has since been amended, it has stood as the law of Pennsylvania from the date of its enactment to the present time. (17 P. S., secs. 2041–2045.)

The history of legislation in New York concerning punishment for contempt has a similarly interesting background. In 1803, Chancellor Kent asserted the same broad summary power which had been maintained by Chief Justice McKean in Pennsylvania. (*People* v. *Freer,* 1 Caines (N. J.), 518.) However, the power was moderately used in New York, and only once did public clamor arise over its exercise. That occasion grew out of an attachment of one Yates, who was charged with illegally practicing as a solicitor—a contempt which is within the historic scope of the power to punish summarily. Yates sought *habeas corpus* in the Supreme Court and the writ was dismissed, after which he appealed to the "Court for the Trial of Impeachment and the Correction of Errors", which consisted of the justices of the Supreme Court and the members of the state senate. That body reversed the Supreme Court and held that Yates should have been discharged. (*Case of J. V. N. Yates* v. *People,* 6 Johns. (N. Y.) 337.)

Yet it was not until 1829 that New York limited the judicial power in contempt proceedings. By legislation then adopted, with the exception of permitting punishment of "a false, or grossly inaccurate report of its proceedings", the summary powers of the New York courts were confined to direct contempts tending to interrupt the proceedings of these courts and to any resistance to or disobedience of their orders or process. (N. Y. Rev. Stat. of 1829, part 3, chap. 3, title 2, art. 1, sec. 10.) Historically, it is said that this statute reflects the views of Edward Livingston, who considered the power of summary punishment to be repugnant "to all the fundamental principles which secure private rights in the administration of justice", and argued that there is no true necessity for a court to undertake the punishment of its own offenders. (See Nelles and King, *supra,* p. 419.)

The early development of the contempt power in the federal courts presents a true parallel to the Pennsylvania experience. Section 17 of the Judiciary Act of 1789 empowered the courts of the United States "to punish by fine or imprisonment . . . all contempts of authority in any cause or hearing before the same". There were several cases under this provision containing intimations of "inherent" power (*United States* v. *Hudson,* 7 Cranch, 32 [3 L. Ed. 259]; *Anderson* v. *Dunn,* 6 Wheat. 204, 227 [5 L. Ed. 242]), but

the first decision directly passing upon a conviction for contempt by publication, summarily imposed, did not arise until the notorious Peck-Lawless controversy in 1826.

With the acquisition of the Louisiana territory earlier in the century, there was a wild speculative scramble for land claims. Although public lands in the territory had not yet been opened up for preemption, previous grants by Spanish and French authorities were recognized. In efforts to prove such grants fraud and forgery were rife, and there was great public interest in litigation over land claims. Lawless, who was an attorney representing a large group of claimants, appeared as counsel in a case brought to test the validity of such a grant. Judge Peck, the federal judge for Missouri, decided one case against him, and Lawless countered with a newspaper article criticizing the decision. Judge Peck promptly attached Lawless for contempt and, after a hearing, found him guilty, imposing a sentence of one day's imprisonment and suspension from practice for eighteen months.

Lawless, who had influential friends in Washington, then memorialized Congress for Peck's impeachment. After a trial which consumed a large part of the session of 1830–1831, Judge Peck was acquitted by a narrow margin. (See Stansbury, Trial of James H. Peck (1833).) However, the episode immediately precipitated legislation on the question of summary judicial power in contempt proceedings. A federal statute enacted in 1831 provided that ''the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court shall not be construed to extend to any cases except the misbehavior of any person or persons in the presence of said courts, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of the said courts . . . and the disobedience or resistance by any officer . . . party, juror, witness or any other person . . . to any lawful writ, process, order, rule, decree or command of the said courts''.

The words ''misbehavior . . . so near thereto as to obstruct the administration of justice'' were inserted to include, within the definition of contempts, breaches of the peace near the courthouse which might interrupt judicial proceedings. (See Nelles and King, *supra,* p. 530.) By other provisions of the statute, acts formerly designated as contempts,

such as attempts to influence jurors, witnesses or officers or attempts to obstruct or impede the administration of justice by threats or force were made punishable by the regular process of indictment and trial. (Act of March 2, 1831, c. 99; 4 Stat. 487; now U. S. Code, secs. 385 and 241.) Again, by legislation, summary judicial power was expressly restricted to its true historic limits.

General public agreement with the policy exemplified by the federal statute and those of Pennsylvania and New York is indicated by the fact that numerous other states soon adopted similar laws. By 1860, twenty-three of the thirty-three states of the Union had adopted acts limiting the summary power to punish for contempt. (See Nelles and King, *supra,* p. 533.) And with the exception of New Hampshire and Arkansas, these limitations were respected in every jurisdiction where they were questioned. (*Ex parte Poulson,* Fed. Cas. No. 11350, 1205–1209 (1835); *United States* v. *Holmes,* Fed. Cas. No. 15383 (1842); *Stuart* v. *People,* 3 Scram. 395 (Ill. 1842); *Ex parte Hickey,* 4 Smedes & M. 751 (Miss. 1844); *Dunham* v. *State,* 6 Iowa, 245 (1858); *Brown & Calkins Case* (1854), see *State* v. *Eau Claire,* 97 Wis. 1, 11 [72 N. W. 193, 65 Am. St. Rep. 90, 38 L. R. A. 554]; *Foster* v. *Commonwealth,* 8 Watts & S. 77 (Pa. 1844).)

The New Hampshire court held that the writer of an article constituting a contempt might be punished summarily, notwithstanding the statute of that state, but in reaching that conclusion it relied upon *Respublica* v. *Oswald, supra,* which, as has been pointed out, followed the fallacious doctrine of Blackstone based upon the writing of Judge Wilmot. (*Tenney's Case,* 23 N. H. 162, 185.) This decision has not attracted general attention and is referred to infrequently. However, the case of *State* v. *Morrill,* 16 Ark. 384, like *The King* v. *Almon, supra,* has had on unusual influence in shaping the law concerning contempts. It has been cited and relied upon as an authority in many states, including California, and as it is the first decision in the United States which set aside a statute limiting a court's jurisdiction over alleged contempts, it merits particular attention.

In an editorial in his newspaper, Morrill intimated that the justices of the state Supreme Court had been guilty of bribery in a criminal case. They summoned him to show cause why he should not be adjudged in contempt. In a lengthy opin-

ion, which added little that was new to the subject, the court sustained its power to punish summarily notwithstanding legislative limitation to specified acts "and no others". By constant repetition, factitious weight was given to the assumption that such power is inherent, necessary, and traditional. The court quoted at length from Blackstone, *Roach* v. *Garvan, supra; Respublica* v. *Oswald, supra; The King* v. *Almon, supra,* and from earlier Arkansas cases of direct contempt. Cases which had sustained the limitations placed by Congress upon the federal courts were held inapplicable upon the ground that the lower federal courts were the creatures of Congress and not of the Constitution. The Peck-Lawless case was distinguished upon the ground that Lawless had "published a criticism upon the opinion, not impugning the motives or charging corruption upon the judge, but discussing the correctness of the opinion" and "the distinction between constitutional freedom, and licentious abuse of the press, is now so well understood in this country, that no American judge could consider himself authorized to punish as for contempt, authors of publications of the character of that made by Mr. Lawless".

Morrill was finally discharged upon filing a response under oath denying any intention to commit a contempt. (*State* v. *Morrill,* 16 Ark. 384, 412.) But this decision led the way for a series of cases which cast off the legislative fetters in almost every jurisdiction where they had been imposed. (See Nelles and King, *supra,* pp. 554, 562.) The basis of the asserted authority of a court to ignore statutory regulation of the power to summarily punish for contempt was, most frequently, said to be that it is unconstitutional, as trenching upon an inherently necessary and immemorially exercised power. (See for example, *State* v. *Shepherd,* 177 Mo. 205 [76 S. W. 79, 99 Am. St. Rep. 624] ; *State* v. *Frew,* 24 W. Va. 416 [49 Am. Rep. 257].) Other cases hold that legislation on the subject of inherent judicial power is merely declaratory and is not binding on the courts. (See *Dale* v. *State,* 198 Ind. 110 [150 N. E. 781, 49 A. L. R. 647].)

In a third class of cases the same result was achieved by construing the phrase "in the presence of the court or so near thereto", adopted from the federal statute, as applying to contempts by publication, upon the theory that a widely circulated newspaper is constructively present in or near to the

court. (See *People* v. *Wilson,* 64 Ill. 195 [16 Am. Rep. 528] ; *Myers* v. *State,* 46 Ohio St. 473 [22 N. E. 43, 15 Am. St. Rep. 638].) Only in Pennsylvania, New York, Kentucky and (probably) South Carolina have the legislative limitations been respected. (*Ex parte Steinman,* 95 Pa. St. 220 [40 Am. Rep. 637] ; *Rutherford* v. *Holmes,* 5 Hun, 317, 319, affd. 66 N. Y. 368; *Adams* v. *Gardner,* 176 Ky. 252 [195 S. W. 412]), but it is worthy of note that the courts of these states have become neither contemptible nor inefficient.

For some seventy-five years, the federal courts construed the congressional statute as a limitation upon their power to summarily punish for a constructive contempt. (*Ex parte Poulson,* (1835) *supra; Ex parte Robinson,* (1873) 19 Wall. 505, 510 [22 L. Ed. 205].) After 1900, moreover, there were indications that the requirement of physical proximity might be interpreted so as to include newspaper comment (*Ex parte McLeod,* (1903) 120 Fed. 130, 140; *United States* v. *Huff,* (1913), 206 Fed. 700, 704), but it was not until 1915 that the "constructive presence" doctrine was extended to contempts by publication. In that year the Toledo *News-Bee* published articles and cartoons which intimated that a United States district judge was biased in litigation pending between the city of Toledo and a traction company. The newspaper and its editor were adjudged guilty of contempt in a summary proceeding (*United States* v. *Toledo Newspaper Co.,* 220 Fed. 458) ; and the judgment was sustained by the United States Supreme Court in *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402 [38 Sup. Ct. 560, 62 L. Ed. 1186], Justices Holmes and Brandeis dissenting. Chief Justice White, who wrote the majority opinion, held that it was "essential to recall the situation existing at the time of the adoption of the Act of 1831 in order to elucidate its provisions", but his research apparently stopped with his own opinion written a year and a half earlier in *Marshall* v. *Gordon,* 243 U. S. 521 [37 Sup. Ct. 448, 61 L. Ed. 881, Ann. Cas. 1918B, 371, L. R. A. 1917F, 279], dealing with the power of Congress to punish summarily for contempt. An analogy was drawn between the powers of Congress and those of the courts, and he asserted that each was based upon the "right of self-preservation". This is the doctrine of "inherent necessity" in a new garb.

Regardless of the fact that judicial power had been limited by the Statute of 1831, the court had "no doubt that the provision conferred no power not already granted and imposed no limitations not already existing". This conclusion is palpably and demonstrably incorrect when considered in the light of the historical background in which the federal statute was conceived. The federal courts, although by statute stripped of their power to punish contumacious editors, had transacted judicial business for almost a century without loss of either prestige or independence, yet Justice White said that freedom of the press "cannot be held to include the right virtually to destroy". The omission in the federal act of the tautological provision of the Pennsylvania act expressly abolishing contempts by publication, was considered by him to be "the strongest possible evidence of the purpose not to enact such provision". (For a searching criticism of the majority opinion, see Frankfurter and Landis: Power of Congress over Procedure in Criminal Contempts, 37 Harv. L. R. 1010.)

In California the first legislature expressly provided that the courts might punish for contempts. (Stats. 1850, chap. 33, sec. 13.) Under this statute the "power to punish in a summary manner, by fine or imprisonment, or either, for contempts offered to them while in session, or to any process, writ, rule, or order of said courts issued and made, or for disobeying any writ, process, or order thereof, or for obstructing or preventing the execution of the same, and the judgments, decrees, and determinations of said Courts in such cases shall be final and conclusive. . . . "

The law was soon put to a test. Early in 1851 William Walker, the editor of the San Francisco *Herald*, published an article referring to Judge Parsons with biting scorn. Also attacking the courts generally, the writer said: "They cover crime with the folds of the ermine; they lift their impotent arms to scourge an unfettered press with the rods of justice, as they style it. They drop the tears of a bastard mercy upon the robbers and the assassins who threaten our lives and our property; they turn with a scowl of wrath and an arm of vengeance upon the press which dares to complain of the tenderness with which offenders are treated."

Cited for contempt of court in summary proceedings, Walker was adjudged guilty, his punishment was fixed at a

fine of five hundred dollars and he was ordered to stand committed until the same should be paid. In a written opinion Judge Parsons pointed out that the legislature had not defined "what shall or shall not be a contempt", and relying upon some statements of Chancellor Kent in *People* v. *Freer, supra,* he held that the power to punish summarily had existed in English and American courts "time out of mind" and "is exercised . . . in all the states of the Union, unless a statute exists expressly taking away from the courts that power". (Matter of Impeachment, 1 Cal. 542.)

Immediately upon his commitment, Walker memorialized the assembly of the legislature for the impeachment of Judge Parsons. A special committee submitted a report taking as precedents the Peck-Lawless and *Respublica* v. *Oswald* cases and recommending impeachment. But the assembly refused to adopt the report, and appointed another special committee. The second committee found in early expressions of Chief Justice McKean of Pennsylvania and Chancellor Kent of New York, common law sanction for the use of summary power and declared that section 13 of the District Court Act did not explicitly limit that power; hence "If there be fault anywhere, it is attributable to the obscurity of this section of the act, rather than to the interpretation put upon it by the court." The committee, therefore, concluded that Walker's charges "show no cause for impeachment" of Judge Parsons but was "induced to recommend the passage of a law, more explicitly defining contempts of court and the power of courts to punish them".

At the second session of the legislature, section 480 of the Practice Act was enacted. (Stats. 1851, chap. 5, tit. 13, p. 126.) In general, this section defined contempt of court as any misbehavior or breach of the peace in the presence of the court or its immediate vicinity which tends to interrupt the due course of trial or any disobedience of process. Section 1209 of the Code of Civil Procedure, enacted in 1872, adopted the Practice Act definition of contempt, together with several additions to it. Official misconduct of judicial officers, abuse of process, acting as an officer of the court or attorney without authority or license, interference with jurors or witnesses, and disobedience of the order of a superior court by an inferior tribunal were brought within the

summary power, as was also "any other unlawful interference with the process or proceedings of a court". (Subd. 9.)

Not until 1890 did anyone challenge the application of this section to contempts by publication. At that time one Barry, who was editor of the San Francisco *Weekly Star,* published a particularly violent denunciation of Francis W. Lawler, a superior court judge, for sustaining a demurrer to a suit to oust a city supervisor from office. Barry was found guilty of contempt in a summary proceeding before three other judges of the superior court. The Supreme Court denied his application for *habeas corpus* upon the ground that the editorial was an "unlawful interference with the proceedings of a court" within the meaning of subdivision 9 of section 1209 of the Code of Civil Procedure. (*Ex parte Barry,* 85 Cal. 603 [25 Pac. 256, 20 Am. St. Rep. 248].)

Criticism of the decision soon appeared in several San Francisco newspapers. The *Morning Call* characterized the court as "accuser and judge" and argued that the accused should have been allowed a jury trial, as was then the practice of the federal courts in such cases. The San Francisco *Evening Bulletin* of September 13, 1890, stated in part, "The decision of the Supreme Court in the case of Editor Barry is exciting a great deal of unfavorable comment. Whether he libelled or not one of the Superior Judges cuts no figure in the case. The main fact is that he is to be punished without a hearing. . . . " In the San Francisco *Chronicle* of September 22, 1890, appeared an editorial which concluded: "All that can be done, if the Supreme Court adheres to its ruling in the Barry case, is to amend the statute by a negative clause, declaring that an attack upon the integrity of a judge made in the columns of a newspaper or other publication is not a contempt of court. If it come within the definition of a libel, the proprietor of the newspaper must stand the consequences. That is the responsibility which the Constitution and the law impose upon the newspaper, and which it cannot escape if it would; but to have its mouth closed thereafter, and to be precluded from making its defense before a jury, is not in harmony with either the spirit or the letter of the law, organic as well as statutory."

It is interesting to note that within a few months after this decision the legislature of 1891 amended section 1209 of the Code of Civil Procedure by providing that "no speech

or publication reflecting upon, or concerning any court, or any officer thereof, shall be treated or punished as a contempt of such court unless made in the immediate presence of such court while in session, and in such a manner as to actually interfere with its proceedings". But this restriction upon the judicial power was soon declared unconstitutional. (*In re Shortridge*, 99 Cal. 526, 532 [34 Pac. 227, 37 Am. St. Rep. 78, 21 L. R. A. 755].) The "inherent necessity" doctrine, said Justice Paterson, is "founded upon the principle—which is coeval with the existence of the courts, and as necessary to the right of self-protection—that it is a necessary incident to the execution of the powers conferred upon the court, and is necessary to maintain its dignity, if not its very existence". Admitting that the legislature had the right "to regulate the procedure and enlarge the power", the court also held that it could not "without trenching upon the constitutional powers of the court and destroying the autonomy of that system of checks and balances, which is one of the chief features of our triple department form of government, fetter the power itself".

To support the court's conclusions it cited only the Arkansas case of *State* v. *Morrill, supra,* which was said to be "in line with all of the authorities". But aside from the lack of precedent for the decision, it is entitled to no consideration in defining the law of contempt because the judgment against the offending editor was set aside upon the ground that, considering all of the facts, "the publication could not, under any circumstances, constitute a contempt". Yet in *People* v. *Durrant,* 116 Cal. 179, 209 [48 Pac. 75], it was cited for the *obiter* statement that a publication calculated to influence a decision is punishable as a contempt. Also, the same *dictum* was quoted in *Lamberson* v. *Superior Court,* 151 Cal. 458, 461 [91 Pac. 100, 11 L. R. A. (N. S.) 619], *Paddon* v. *Superior Court,* 65 Cal. App. 34 [223 Pac. 91], and *In re Mason,* 69 Cal. App. 598 [232 Pac. 157], but in each of these cases the petitioner was charged with a direct contempt, and no question concerning the constitutionality of that portion of section 1209 of the Code of Civil Procedure relating to contempts by publication was properly before the court. In the Lamberson case, the petitioner had filed a contumacious affidavit charging a judge with bias and lack of integrity. This, the court held, was a contempt committed in the presence of the court. The acts complained

of in the Paddon and Mason cases were contempts of the same character, and were spoken of as having been done ''in the face of the court''. In the former, the petitioner refused to obey a subpoena and filed an affidavit in court stating his refusal; the contemner in the Mason case violated a court order.

In *McClatchy* v. *Superior Court,* 119 Cal. 413 [51 Pac. 696, 39 L. R. A. 691], it appears that the court was of the opinion that a false report of pending litigation was punishable as a contempt, but the order committing the alleged contemner was annulled upon the ground that he had not been given a fair hearing. However, *In re Lindsley,* 75 Cal. App. 122 [241 Pac. 934], and *Lindsley* v. *Superior Court,* 76 Cal. App. 419 [245 Pac. 212], each holds that the publication of newspaper comment on pending litigation is a contempt of court punishable in a summary proceeding, although the question of the validity or applicability of subdivision 13 of section 1209 of the Code of Civil Procedure does not appear to have been raised, and it was not discussed in either opinion. The first case cites 13 C. J. 34 to the effect that ''it is a contempt to issue publications which are calculated to prejudice or prevent fair and impartial action in a cause of judicial investigation then pending''. The second case, which arose out of the same proceeding in the superior court, holds that a contempt under subdivision 9 of section 1209 was sufficiently proved.

The *dictum* of *In re Shortridge, supra,* was again quoted in *Blodgett* v. *Superior Court,* 210 Cal. 1 [290 Pac. 293, 72 A. L. R. 482], which is another case in which the facts show that there was a direct contempt. *In re Hallinan,* 126 Cal. App. 121 [14 Pac. (2d) 797], is in the same category. The Shortridge case was there relied upon to sustain the trial court's power to punish an attorney who was guilty of disorderly conduct during the course of a trial.

In *Ex parte Shuler,* 210 Cal. 377, 397 [292 Pac. 481], and *In re San Francisco Chronicle,* 1 Cal. (2d) 630 [36 Pac. (2d) 369], this court for the first time directly held that the limitation upon the power of the courts to punish contemners by publication is unconstitutional. Little consideration was given to the subject in either opinion, the court relying entirely upon the *dictum* in the Shortridge case and the intervening cases which cited that case or quoted from it. However, mere reiterations of the doctrines of ''inherent neces-

sity'' and ''immemorial usage'' are not authority for their validity.

The notion that contumacious publications have been subject to the summary power from time immemorial has been shown to be historically incorrect. Also, the experience of Pennsylvania and other jurisdictions where immunity of the press has long been maintained conclusively proves that no such power is necessary to maintain either the existence of courts or the respect for them. It is not necessary to the wholesome administration of justice in this state that judicial officers have uncontrolled discretion in passing upon alleged constructive contempts of court. The opportunity for arbitrary punishment often provides the occasion for it. Noise, interruptions, violence of any kind in the course of judicial proceedings must be repressed; obedience to all lawful orders must be enforced. To uphold its authority when challenged by such affronts to the judicial procedure, a court may and should summarily punish the offender. But indirect contempts, particularly publications in a newspaper, are entirely different in their nature and consequences.

The rights of freedom of speech and of the press have their roots deep in the soil of this nation's organic law. Five days before the Declaration of Independence was proclaimed, the patriots of Virginia declared in their Constitution ''that the freedom of the press is the great bulwarks of liberty, and can never be restrained but by despotic governments.'' For more than a century and a half our nation has consistently upheld this right of expression by a free people as a vital principle which the founders of our national and state governments stated in the respective constitutions as necessary to a democracy.

''Congress shall make no law . . . abridging the freedom of the press.'' (Art. I, U. S. Const.) The positive scope of this guarantee was stated by Mr. Justice Harlan in the celebrated case of *Patterson* v. *Colorado,* 205 U. S. 454 [27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689]), as follows: ''I go further and hold that the privileges of free speech and of a free press, belonging to every citizen of the United States, constitute essential parts of every man's liberty . . . It is, I think, impossible to conceive of liberty, as secured by the Constitution against hostile action, whether by the nation or by the states, which does not embrace the right to enjoy free speech and the right to have a free press.'' Similarly

our state Constitution ordains that "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." (Art. I, sec. 9, Cal. Const.)

These provisions are binding upon the courts, and no claims of judicial necessity can outweigh them. When free speech is fettered, liberty is a meaningless word.

The judgment should be annulled.

Rehearing denied. Edmonds, J., Carter, J., and Gibson, J., voted for a rehearing.